9 F.3d 607
 62 USLW 2340, 38 Fed. R. Evid. Serv. 925,
Prod.Liab.Rep.(CCH)P. 13,685
 Phyllis PORTER, Individually and as the Administratrix of
the Estate of Manual Porter, Plaintiff-Appellant,
v.
WHITEHALL LABORATORIES, INC., American Home Products
Corporation, and the Upjohn Company, Defendants-Appellees.
 Nos. 92-1962, 92-2231.
 United States Court of Appeals,
Seventh Circuit.
 Argued Oct. 29, 1992.
Decided Nov. 1, 1993.
 
 Vernon J. Petri, David E. Schalk, Indianapolis, IN, Kenneth John Chesebro (argued), Cambridge, MA, for Phyllis Porter.
 Bonnie L. Gallivan, Ralph A. Cohen (argued), Angela K. Wade, Ice, Miller, Donadio & Ryan, Indianapolis, IN, for Whitehall Laboratories, Inc., American Home Products Corp.
 William P. Wooden (argued), Katherine L. Shelby, Wooden, McLaughlin & Sterner, Indianapolis, IN, for Upjohn Co.
 Before FLAUM, RIPPLE, and MANION, Circuit Judges.
 RIPPLE, Circuit Judge.
 
 
 1
 Manual Porter[1] instituted this action under our diversity jurisdiction seeking recovery from the defendants on a variety of theories for injuries sustained by ingesting ibuprofen. The defendant Whitehall Laboratories is a subsidiary of American Home Products Corporation (collectively "the Whitehall defendants") and manufactures Advil, a pain reliever containing ibuprofen. The Upjohn Company makes a prescription strength drug, Motrin, which contains ibuprofen. The district court granted summary judgment in favor of the defendants. Mr. Porter appealed. The case was argued on October 29, 1992. We delayed judgment because of the pendency in the Supreme Court of the United States of Daubert v. Merrell Dow Pharmaceuticals, Inc., --- U.S. ----, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). After the Supreme Court rendered its decision in Daubert, the parties submitted, at our request, supplemental briefing. We now affirm the judgment of the district court.
 
 
 2
 * BACKGROUND
 
 A. Facts
 
 3
 On October 3, 1986, Manual Porter fractured his left great toe at work. He sought treatment first from Dr. Diane Wells, an internist, who referred Mr. Porter to Bloomington Hospital. At the hospital, Mr. Porter was treated by Dr. Jones. Dr. Jones set a surgery date of October 10, 1986 to reset Mr. Porter's toe. Dr. Jones also prescribed Tylenol # 3, a pain reliever, until the surgery.
 
 
 4
 Because of his continuing pain, Mr. Porter called Dr. Wells on October 4, 1986. Dr. Wells' nurse practitioner gave Mr. Porter samples of Motrin, a prescription form of ibuprofen, and Vicoden, an acetaminophen. Dr. Wells did not recall reviewing the message and response to Mr. Porter's call; however, she knew of no medical condition that would preclude Mr. Porter's taking ibuprofen.[2] Mr. Porter took fourteen Motrin tablets between October 13, 1986 and November 7, 1986. Mr. Porter took approximately fifteen Advil tablets between November 7 and November 18, 1986.
 
 
 5
 Other than his injured toe, Mr. Porter had no significant health problems prior to November 19, 1986. On that day, he returned to Dr. Wells' office with complaints of headache, vomiting, and blurred vision. Dr. Wells examined Mr. Porter and found that he was suffering from high blood pressure, significant papilledema (swelling of the fundi of the eyes), and puffiness of the face. Based on these symptoms, Dr. Wells had Mr. Porter transferred by ambulance to Bloomington Hospital for treatment by Dr. Richard Combs, a nephrologist. Dr. Combs conducted a series of tests which revealed that Mr. Porter was experiencing kidney failure from which he would not recover. Dr. Comb's diagnosis of Mr. Porter's condition at that time was acute tubular necrosis secondary to ibuprofen; specifically, upon Mr. Porter's discharge on December 5, Dr. Combs wrote: "The patient's ... Ibuprofen reactions have both an interstitial and glomerular reaction and I believe this can explain all of his problems." Loose Pleadings VI, ex. 2.
 
 
 6
 In January 1987, Mr. Porter was readmitted to Bloomington Hospital for a renal biopsy. That biopsy revealed rapidly progressive glomerulonephritis ("RPGN"). Glomerulonephritis is an inflammation and disease of the filtering unit in the kidney that causes decreased renal function. RPGN describes how rapidly the kidney function decreases when inflamed by glomerulonephritis. RPGN is a rare and serious disease which leads to end-stage renal failure in a significant number of cases without any ibuprofen or other drug use. Mr. Porter suffered from the types of RPGN known as anti-glomerular basement membrane glomerulonephritis ("anti-GBM") and membranoproliferative glomerulonephritis ("MPGN"). Ibuprofen is not known to be a cause of these or any other types of RPGN.
 
 
 7
 Mr. Porter's biopsy also indicated that he suffered from interstitial nephritis which often occurs as a secondary result of glomerulonephritis. There is no scientific evidence that the opposite is true--that interstitial nephritis will progress to RPGN. Studies have linked the use of ibuprofen with interstitial nephritis.
 
 
 8
 The experts examining Mr. Porter's records have explained Mr. Porter's kidney failure in two ways. Dr. Fred Ferris, who participated in the transplant, and Dr. William Dick, Mr. Porter's treating nephrologist at Bloomington Hospital, testified that Mr. Porter's kidney failure was caused by anti-GBM RPGN. The other experts testified that Mr. Porter's failure was caused by RPGN, but did not identify which type of RPGN disease process, anti-GBM or MPGN, caused the failure.
 
 
 9
 In their motion for summary judgment, defendants contended that the record failed to establish a genuine issue of fact that ibuprofen is capable of causing anti-GBM, MPGN, or any other type of RPGN, or that ibuprofen caused Mr. Porter's RPGN. Furthermore, they argued that the record failed to establish that a genuine issue of fact existed with regard to ibuprofen causing a change from interstitial nephritis to RPGN.
 
 B. Decision of the District Court
 
 10
 In its analysis, reported at Porter v. Whitehall Laboratories, Inc., 791 F.Supp. 1335 (S.D.Ind.1992), the district court first noted that Mr. Porter must establish a causal nexus between ibuprofen and his acute renal failure to prevail on any of his counts. There were two basic theories upon which such a showing of causality could rest. First, he could have shown that ibuprofen caused interstitial nephritis which caused renal failure. As the district court put it: Ibuprofen f Interstitial Nephritis f Renal Failure. Id. at 1341. Second, he could have shown that ibuprofen caused interstitial nephritis, which caused RPGN, which caused renal failure. In the district court's terms: Ibuprofen f Interstitial Nephritis f RPGN f Renal Failure. Id.
 
 
 11
 The district court next determined that expert testimony was necessary to assist the jury in determining causation. It concluded that "[w]hether Mr. Porter's acute renal failure was an iatrogenic reaction to ibuprofen is a fact outside the understanding of lay jurors." Id. Furthermore, because an expert opinion must be admissible to be considered in the determination of a motion for summary judgment, the district court next evaluated the admissibility of the expert testimony offered by Mr. Porter. In undertaking this task, the district court employed an analysis grounded in the Federal Rules of Evidence.
 
 
 12
 An expert must clear three independent steps (or tests) before the expert's testimony is admissible. First, the person must be "qualified as an expert by knowledge, skill, experience, training, or education." Fed.R.Evid. 702. Second, the court must find that "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Id. Third, the particular instant facts or data upon which an expert bases an opinion or inference must be "of a type reasonably relied upon by experts in the particular field informing opinions or inferences upon the subject." Fed.R.Evid. 703.
 
 
 13
 Porter, 791 F.Supp. at 1342.
 
 
 14
 The district court focused on the second part of this test. The critical question, noted the district court, is whether the expert can shed light on a controverted fact to assist the jury in its evaluation. The expert performs this function, continued the district court, by comparing data from the case before the court with known scientific relationships and then stating a conclusion about that data based on the comparison. In assessing the admissibility of an expert's testimony, the district court proceeded, it is first necessary to evaluate the basis of the scientific knowledge that the expert intends to use as the foundation for his conclusion. In this regard, noted the court, Rule 702 governs the inquiry. "If an opinion lacks foundation and would 'not actually assist the jury in arriving at an intelligent and sound verdict,' then it is inadmissible." Id. at 1343 (quoting Loundermill v. Dow Chem. Co., 863 F.2d 566, 570 (8th Cir.1988)). An expert's mere guess or conjecture, continued the court, must be excluded; "an expert is a conduit of facts and not merely a subjective speculator relying on stature alone." Id.
 
 
 15
 The court then turned to a description of the adjudicative facts of the instant case that might be used by the expert in reaching a conclusion. For these types of facts to be admissible, they must be
 
 
 16
 reasonably relied upon by experts in the particular field in forming the ultimate opinion rendered by the experts in this matter.... Thus, if a nephrologist or renal pathologist would reasonably determine the fact of causation from the medical facts known about Manual Porter, then Rule 703 is satisfied.
 
 
 17
 Id. In short, the facts of the case must fit the scientific analysis to which they are being applied:
 
 
 18
 To determine whether the particular facts or data known about the instant case are of a type reasonably relied upon by experts, the Court must consider the methods reasonable medical experts in nephrology or renal pathology would use to arrive at etiological conclusions. These methods will of course vary depending upon the particular scientific discipline at issue and the current state of their understanding of the fact at issue. In general, for facts and data to be of a type reasonably relied upon by experts to form an opinion, there must be a connection between the currently-observed facts and some known scientific paradigm.
 
 
 19
 Id.
 
 
 20
 The district court then evaluated the testimony of the various experts offered by the plaintiff to determine whether their opinions met the requirements of Rules 702 and 703. The court first noted that "[e]very medical expert in this matter agrees that there is no scientific data establishing a causal link between ibuprofen and RPGN or between interstitial nephritis and RPGN." Id. at 1344. The court acknowledged that Drs. Wells, Richard Combs, Francesco Del Greco, and David Benjamin, Ph.D., had at one time made statements that supported plaintiff's theories of causation. Dr. Wells, however, is not a nephrologist and, moreover, admitted that her view was merely a " 'curbside' observation based solely on a temporal relationship." Id. Dr. Combs had made general statements linking Mr. Porter's problems to ibuprofen, but acknowledged that there were no scientific studies or data supporting his opinion. Id. His observations, too, were based merely on the temporal relationship between the ingestion of ibuprofen and the injury. Dr. Del Greco testified that he had "performed extensive research on the effects of ibuprofen on the kidney"; however, "he could not cite any personal study confirming his theoretical opinion" that ibuprofen caused the injury. Id. Dr. Del Greco also
 
 
 21
 opined that interstitial nephritis was the primary event causing RPGN because he believed the interstitial nephritis lesions were older than the anti-GBM lesions. He prefaced his opinion of causation by saying that regarding the "chronology or sequence of events, I think one has to speculate."
 
 
 22
 Id. (citations omitted). Finally, Dr. Benjamin stated that it was his opinion that ibuprofen caused Mr. Porter's RPGN, but could not support his opinion with personal research or other scientific evidence. Id. After reviewing this testimony, the court concluded that
 
 
 23
 [no] expert can state the opinion that Mr. Porter's injury was caused by a known iatrogenic reaction, because there is no such known reaction.... [T]he experts offer a mere possibility of an unsupported and therefore hypothetical explanation for the acute renal failure. The "opinion" that the facts of a case fit an expert's own unsupported, unproven hypothesis does not help determine a fact in issue and is therefore inadmissible.
 
 
 24
 Id. (emphasis in original).
 
 
 25
 Finally, the district court related the proffered expert opinions to the burden of proof. Under Indiana law, the claimant must prove every element of a prima facie case, including causation. "This mandatory causal connection must be established by 'provable facts' and 'cannot be based upon mere guess, conjecture, surmise, possibility or speculation.' " Id. at 1346 (citations omitted). Because plaintiff's experts did not base their opinions on provable facts, their testimony could not meet Indiana's burden of proof requirement. The district court stated that this type of naked opinion was not a specific fact that could preclude summary judgment under Federal Rule of Civil Procedure 56. Id. at 1348. Consequently, the district court concluded, the plaintiff had not set forth a genuine issue of material fact to preclude summary judgment.
 
 II
 ANALYSIS
 A. Standard of Review
 
 26
 We review a district court's grant of summary judgment de novo. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In doing so, we recognize that Indiana law places the burden of proof on the plaintiff to establish all of the elements of her cause of action, including causation. Lantis v. Astec Indus. Inc., 648 F.2d 1118, 1120 (7th Cir.1981) (applying Indiana law). When this is the case, "Rule 56(c) mandates the entry of summary judgment ... against a party who fails to establish the existence of an element essential to that party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Consequently, we evaluate anew whether the plaintiff has set forth evidence that creates a genuine issue of material fact with regard to what caused Manual Porter's injuries.
 
 B. The Daubert Opinion
 
 27
 We agree with the district court that expert testimony is necessary to determine the cause of Mr. Porter's renal failure. We further agree that, to be considered in a motion for summary judgment, the testimony must be admissible. Fed.R.Civ.P. 56(e) ("Supporting and opposing affidavits shall set forth such facts as would be admissible in evidence...."). The Supreme Court recently addressed the admissibility of scientific evidence in Daubert v. Merrell Dow Pharmaceuticals, Inc., --- U.S. ----, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Therefore, we look to Daubert for guidance in determining the admissibility of the expert testimony offered by the plaintiff.
 
 
 28
 In Daubert, plaintiffs in a strict liability action sought to introduce expert testimony that their mothers' ingestion of Bendectin during pregnancy caused their birth defects. Although many epidemiological studies failed to link the two, plaintiffs' experts claimed that there was a link based on in vitro and in vivo testing, on studies of the chemical structure of Bendectin, and on the reanalysis of previously published epidemiological studies. The district court applied the Frye test. See Frye v. United States, 293 F. 1013 (D.C.Cir.1923). Because the principle on which the opinions were based was not sufficiently established to have general acceptance in the field to which it belongs, the district court ruled the testimony inadmissible. The appellate court affirmed, but the Supreme Court reversed.
 
 
 29
 The Court held that the test enunciated in Frye, which required the use of generally accepted methods,[3] has been superseded by the Federal Rules of Evidence. The Rules provide the governing standard for the admissibility of scientific evidence. The Court began its analysis by focusing on the language of Rule 702.[4] It found the rule clearly anticipated "some degree of regulation of the subjects and theories about which an expert may testify." Daubert, --- U.S. at ----, 113 S.Ct. at 2795.
 
 
 30
 The adjective "scientific" implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation. The term "applies to any body of known facts or to any body of ideas from such facts or accepted as truths on good grounds."
 
 
 31
 Id. (citations omitted). The testimony need not be known to a certainty; however,
 
 
 32
 in order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation--i.e., "good grounds," based on what is known. In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.
 
 
 33
 Id. The Court continued by noting that, in determining whether a theory or technique is scientific knowledge, a key question will be whether the theory or technique can be or has been tested. Another relevant consideration is whether the theory or technique is subject to peer review and publication.[5] Especially in the case of a scientific technique, the Court continued, a district court ordinarily ought to consider the known or potential error rate. Although Frye is no longer controlling, "general acceptance" can still have a bearing on the inquiry as to whether the knowledge is scientific. Widespread acceptance by the scientific community is relevant in considering reliability. Id. at ----, 113 S.Ct. at 2797. A known technique that has gained only a minimal following may be viewed with some skepticism.
 
 
 34
 Furthermore, the Court continued, Rule 702 requires that testimony "assist the trier of fact to understand or determine a fact in issue." Fed.R.Evid. 702. This, the Court explained, is essentially a relevance inquiry. " 'Expert testimony which does not relate to an issue in the case is not relevant, and, ergo, nonhelpful.' " Id. at ----, 113 S.Ct. at 2795 (quoting 3 Jack Weinstein & Margaret Berger, Weinstein's Evidence p 702. Thus, "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." Id. at ----, 113 S.Ct. at 2796. The Court summarized its holding by writing:
 
 
 35
 Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.
 
 
 36
 Id. at ----, 113 S.Ct. at 2796 (footnotes omitted).
 
 
 37
 Because the court of appeals and the district court had focused their inquiries entirely on the general acceptance test, the Court remanded the case for further proceedings.
 
 C. Application
 
 38
 We turn now to whether the methodology of the district court, ruling before Daubert, evaluated the proffered expert testimony in a manner compatible with Daubert's rationale. We conclude that the district court's approach is compatible with Daubert.
 
 1.
 
 39
 As we have discussed, the Supreme Court first directs the district court to determine whether the expert's testimony pertains to scientific knowledge. This task requires that the district court consider whether the testimony has been subjected to the scientific method; it must rule out "subjective belief or unsupported speculation." Daubert, --- U.S. at ----, 113 S.Ct. at 2795.
 
 
 40
 This district court's approach anticipated Daubert's directive. The district court posited that the expert must be able to compare the data at hand with a known scientific conclusion or relationship. If experts cannot tie their assessment of data to known scientific conclusions, based on research or studies, then there is no comparison for the jury to evaluate and the experts' testimony is not helpful to the jury. The district court almost verbatim prophesied the language of the Supreme Court. Compare Daubert, --- U.S. at ----, 113 S.Ct. at 2795 ("[T]he word 'knowledge' connotes more than subjective belief or unsupported speculation.") (emphasis added) with Porter, 791 F.Supp. at 1343 ("An expert's mere guess or conjecture is properly excluded....") (emphasis added).
 
 
 41
 The district court, applying this theme, determined that the plaintiff's expert testimony was not derived from the scientific method and therefore did not meet the requirements of Rule 702. Reviewing the testimony of the various experts, we conclude that the district court properly applied the Daubert standard. We evaluate the testimony of each witness that supports plaintiff's theory of causation to determine whether it should have been excluded under Daubert. The testimony of Dr. Diane Wells does not meet Daubert's standards. Dr. Wells testified: "What I'm giving you now is kind of a curb side opinion. If ... you were asking me to give you an analytical, scientific opinion, then, I would have to research it, and I have neither the time nor the inclination to do that." Loose Pleadings IV, ex. 4 at 45. However, a "scientific" opinion is just what Rule 702, as interpreted in Daubert, requires. Moreover, Dr. Wells stated frankly that she had no scientific support for her opinion that ibuprofen caused Mr. Porter's renal condition, and further that she had no evidence that ibuprofen leads to RPGN. Loose Pleadings IV, ex. 4 at 26, 30. Thus, Dr. Wells' testimony was properly excluded. Dr. Richard Combs described Mr. Porter's injuries as "acute renal failure, secondary to ibuprofen." Loose Pleadings III, ex. 3. However, after receiving the pathology report, Dr. Combs reevaluated his diagnosis and admitted that he could not state to a reasonable degree of scientific certainty that ibuprofen caused the RPGN. Loose Pleadings IV, ex. 3 at 28. Like Dr. Wells, he could not point to studies, records, or data on which he based his opinion. Loose Pleadings IV, ex. 3 at 27. The district court properly excluded this evidence because it was not well-grounded in the scientific method.[6]
 
 
 42
 Dr. Francesco Del Greco testified that he believed ingestion of ibuprofen led to interstitial nephritis which in turn caused anti-GBM, the type of RPGN that, according to his diagnosis, Mr. Porter had. However, Dr. Del Greco agreed that his opinion in this case was a "hypothesis, the proof of which remains to be made." Loose Pleadings IV, ex. 6 at 146. He also admitted that if his personal hypothesis turned out to be correct, it would be the first case in history in which ibuprofen caused RPGN. Loose Pleadings IV, ex. 6 at 153. Because this testimony was based on subjective belief alone, it was properly excluded under Daubert. Dr. Fred Ferris theorized that ibuprofen aggravated an independently developed kidney problem. However, Dr. Ferris admitted that this aggravation would be dose-related and would require a far greater dosage than Mr. Porter ingested. Loose Pleadings IV, ex. 7 at 93-94. Because, according to Dr. Ferris' own theory, ibuprofen could not be the cause of an aggravation in Mr. Porter's condition, Dr. Ferris' testimony also was properly excluded. Finally, Dr. Benjamin also theorized a progression whereby ibuprofen caused a kidney condition which progressed to RPGN. However, he admitted that such a conclusion was outside his area of expertise.[7] Because Dr. Benjamin did not possess the requisite scientific knowledge for his testimony to be helpful to the jury, his testimony was properly excluded. Thus, the district court properly applied the first directive the Court gave in Daubert to all of the relevant experts.[8]
 
 
 43
 We have previously noted that the Court set forth some possible criteria for evaluating "whether a theory or technique is scientific knowledge that will assist the trier of fact." Daubert, --- U.S. at ----, 113 S.Ct. at 2796. The first is whether the testimony lends itself to verification by the scientific method. Id. Clearly, the statements offered by the plaintiff's experts could be verified scientifically; however, none of them had been tested. The second criterion is whether the theory has been subjected to peer review. Id. at ----, 113 S.Ct. at 2797. The district court evaluated plaintiff's expert testimony according to this criterion and took into account the fact that there were no published scientific data or evidence in the various studies that had been done, that linked ibuprofen to RPGN, or linked ibuprofen to the progression of interstitial nephritis to RPGN. The third criterion the Court gave is the potential rate of error of the scientific technique. Id. The plaintiff's experts did not propose this factor as a reason for discounting existing studies and therefore the district court had no reason to address it. Finally, the Supreme Court suggested looking at the general acceptance of the method used for gathering scientific evidence. Id. The district court did not address this factor directly because the plaintiff's experts did not identify a method by which they evaluated Mr. Porter's condition. They gave opinions unsupported by any method--generally accepted or otherwise.
 
 2.
 
 44
 The Court's second directive with regard to admitting expert testimony is that a court determine whether the evidence or testimony assists the trier of fact in understanding the evidence or in determining a fact in issue. That is, the suggested scientific testimony must "fit" the issue to which the expert is testifying.[9] The issue of "fit" is applicable to the testimony of both Dr. Benjamin and Dr. Del Greco. As noted above, Dr. Benjamin is a pharmacologist. He testified that, for a pharmacologist determining causation, it would be necessary
 
 
 45
 to determine if there were any other medications that were taken concomitantly which could have been causally related to the effect, to consider the pathophysiological state of the individual, to determine if any abnormal body processes could have contributed to what appear to be an adverse drug effect, to consider any environmental factors, [and] to consider any intercurrent illnesses which might arise.
 
 
 46
 Loose Pleadings IV, ex. 8 at 237-38. To employ this method in analyzing the cause of Mr. Porter's kidney failure, Dr. Benjamin stated it would be necessary to rule out other causes of RPGN. Loose Pleadings IV, ex. 8 at 263. However, Dr. Benjamin could not rule out other causes of RPGN because, by his own admission, he did not know what those causes were. Loose Pleadings IV, ex. 8 at 49, 134.[10] Therefore, Dr. Benjamin could not possibly apply his methodology to Mr. Porter. The district court excluded his testimony on this basis. We think this was proper application of the Court's directive that the method "fit" the factual situation. The idea of "fit" also applies to portions of Dr. Del Greco's testimony. Based on animal experimentation, Dr. Del Greco testified that he believed interstitial nephritis was the primary event causing Mr. Porter's anti-GBM RPGN. Specifically, Dr. Del Greco opined that an interstitial insult was aggravated by a foreign body which led to complete renal failure. Loose Pleadings III, ex. 6 at 79-80. The timing of the lesions is critical to this theory; the interstitial insult must precede the glomerular reaction. The problem for the plaintiff is that Dr. Del Greco could not relate this theory to the factual situation at hand. He stated that, as to the chronology of lesions in Mr. Porter, "one has to speculate." Loose Pleadings III, ex. 6 at 79. He could not establish the factual prerequisite, that the interstitial nephritis in Mr. Porter preceded the anti-GBM RPGN, necessary to apply his theory. Consequently, with his testimony as well, there was no "fit." Thus, the district court properly applied the Court's second directive as well.
 
 Conclusion
 
 47
 Although the district court could not apply the exact test set forth in Daubert, it anticipated well the Court's analysis. The district court made the inquiries required by Daubert and applied them in a way consistent with the Court's direction. We find no error in the analysis of the district court and therefore affirm its judgment.
 
 
 48
 AFFIRMED.
 
 
 
 [1]
 Manual Porter died during the pendency of this action. Phyllis Porter, as administratrix of Manual Porter's estate, was substituted as primary plaintiff by this court's order of May 8, 1992
 
 
 [2]
 Mr. Porter returned to Bloomington Hospital on October 10, 1986 for his toe surgery
 
 
 [3]
 The Frye test has its origin in a "short and citation-free 1923 decision concerning the admissibility of evidence derived from a systolic blood pressure deception test...." Daubert, --- U.S. at ----, 113 S.Ct. at 2793. The Frye test holds inadmissible expert testimony based on a scientific technique unless that technique is generally accepted as reliable in the relevant scientific community. Id. The Frye test was designed to help courts distinguish the experimental from the demonstrable stages of scientific discovery. The extent to which it accomplished this goal has been vigorously debated. See id. at n. 4, 113 S.Ct. at n. 4 (cataloguing the many articles debating Frye's merits). Despite its many critics, however, it remained the majority rule until Daubert. Id. at ---- - ----, 113 S.Ct. at 2792-93
 
 
 [4]
 Federal Rule of Evidence 702 states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."
 
 
 [5]
 The Court noted that publication was not necessary for admissibility and did not always correlate with admissibility
 [I]n some instances well-grounded but innovative theories will not have been published. Some propositions, moreover, are too particular, too new, or of too limited interest to be published. But submission to the scrutiny of the scientific community is a component of "good science," in part because it increases the likelihood that the substantive flaws in methodology will be detected.
 Id. at ----, 113 S.Ct. at 2797 (citations omitted).
 
 
 [6]
 Plaintiff suggests Dr. Comb's experience and first-hand observations are sufficient to provide a basis for comparison to the facts presented here. We disagree. Although we acknowledge that there may be a situation in which personal experiments or observations meet the requirements of Daubert, such is not the case here. Dr. Combs testified that he has encountered only about five cases of anti-GBM RPGN in his career. Loose Pleading IV, ex. 3 at 23. Furthermore, he admitted that his opinion was not based on his observations, but on the medical literature. Loose Pleading IV, ex. 3 at 25. Finally, in that literature, he could not cite a single study that linked ibuprofen to any type of RPGN, nor had he encountered such a case in practice. Loose Pleading IV, ex. 3 at 27, 51
 
 
 [7]
 The interchange in Dr. Benjamin's deposition is illustrative:
 Dr. Benjamin: The point is that all I said was that certain conditions do progress to other conditions. Okay. That is not the same thing as saying that I cannot establish causation to Mr. Porter's renal disease.
 Mr. Cohen: Can you name any condition for me which is known to medical science as progressing, as starting as something else, and then, becoming a membranoproliferative glomerulonephritis?
 Dr. Benjamin: I would have to refer you to a nephrologist to answer that question.
 Mr. Cohen: Because that's not within your area of expertise?
 Dr. Benjamin: That is correct.
 Loose Pleadings IV, ex. 8 at 168.
 
 
 [8]
 Plaintiff also claims that the testimony of Dr. John Niles raises a genuine issue of material fact on causation. Plaintiff rests her argument on the fact that Dr. Niles stated: "He [Mr. Porter] probably has it [anti-GBM]. I don't know if that's been proven on the basis of those." Loose Pleadings VI, ex. 1 at 97. Plaintiff claims that this statement supports the theory that there is disagreement as to the cause of Mr. Porter's renal failure, and therefore that causation is a question the jury should decide. We do not agree. Dr. Niles testified that Mr. Porter "had rapidly progressive glomerulonephritis or the syndrome of rapidly progressive glomerulonephritis." Loose Pleadings VII, ex. 27 at 151. Furthermore, Dr. Niles was certain concerning the cause of Mr. Porter's renal failure:
 Mr. Petri: In your opinion was the cause of Mr. Porter's kidney failure rapidly progressive glomerulonephritis?
 Dr. Niles: Yes.
 Loose Pleadings VII, ex. 27 at 189. That Dr. Niles could not identify which RPGN disease process, anti-GBM or MPGN, was primary is not relevant to plaintiff's theory of causation--that ibuprofen caused interstitial nephritis which led to RPGN. Therefore, because Dr. Niles testified that Mr. Porter had RPGN and that RPGN caused his renal failure, Dr. Niles testimony does not create a genuine issue of fact as to causation.
 
 
 [9]
 The Court in Daubert used the language of Judge Becker, of the United States Court of Appeals for the Third Circuit, who described the consideration of relevance between a scientific theory and facts in issue as one of "fit." --- U.S. at ----, 113 S.Ct. at 2796
 
 
 [10]
 Again, the deposition is instructive:
 Mr. Cohen: Do you claim any expertise in the field of nephrology?
 Dr. Benjamin: Well, I have some expertise in all of these areas, but not sufficient to hold myself out as a freestanding expert in any of these disciplines.
 Mr. Cohen: Can you tell me how many causes there are for rapidly progressive glomerulonephritis in human beings?
 Dr. Benjamin: No sir, I cannot.
 Loose Pleadings IV, ex. 8 at 49. And later, the following interchange took place:
 Mr. Cohen: Are you familiar with all of the medical factors or conditions which can cause rapidly progressive glomerulonephritis?
 Dr. Benjamin: No sir. I am not--all right, let me ask you, did you mean regarding this particular case and Mr. Porter's development of RPGN or just in general?
 Mr. Cohen: In general.
 Dr. Benjamin: Okay. In general, I am not, but I am familiar with the medical history related to this particular case.
 Loose Pleadings IV, ex. 8 at 134.