Arthur E. SCHMALTZ, Plaintiff,

v.

**NORFOLK & WESTERN RAILWAY COMPANY, a corporation,**
**Defendant.**

No. 91 C 6128.

United States District Court,
N.D. Illinois,
Eastern Division.

March 6, 1995.

**1120**

Steven George Bailey, Callis Law Firm, P.C., Granite City, IL and David J. Walker, William J. Harte, Ltd., Chicago, IL, for plaintiff.

Evan Burton Karnes, II, Law Offices of Evan B. Karnes II & Associates, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

BUCKLO, District Judge.

Before the Court is defendant's motion to bar the expert testimony of Drs. Dunlap, Hessl, and Schonfeld pursuant to FED. R.EVID. 702. For the reasons stated herein, defendant's motion is granted.

### Facts

Plaintiff, Arthur E. Schmaltz ("Mr. Schmaltz"), was employed by defendant, Norfolk & Western Railway Company ("N & W"), as a carman. On May 1, 1990, at approximately 7:00 p.m., N & W sprayed areas of the Calumet Yard with two herbicides, atrazine and tebuthiuron, pursuant to its vegetation control policy program. Mr. Schmaltz began his shift in the Calumet Yard on May 1, 1990 at 11:00 p.m., and worked until 7:00 a.m. on May 2, 1990. On the morning of May 2, 1990, Mr. Schmaltz began to experience respiratory irritation. On May 9, 1990, Mr. Schmaltz went to the emergency room at South Suburban Hospital complaining of burning in his throat and esophagus. On May 12, 1990, Mr. Schmaltz saw his own personal physician, Dr. Ann Marie Dunlap ("Dr. Dunlap"), who was unsure of the nature and cause of Mr. Schmaltz's condition and consequently referred him to Dr. Stephen Hessl ("Dr. Hessl").

From July 25, 1990 to April 27, 1992, Mr. Schmaltz was treated by various doctors at the University of Illinois Hospital Occupational Medicine Clinic under the supervision of Dr. Hessl. On the basis of Mr. Schmaltz's description of his symptoms, physical examinations, and pulmonary function tests, Dr. Hessl's group diagnosed Mr. Schmaltz as having Reactive Airway Dysfunction Syn-

drome ("RADS"), an asthma-type respiratory syndrome which occurs after high-level irritant exposures. On three separate occasions since June 21, 1993, Mr. Schmaltz was examined by Dr. Alvin Schonfeld ("Dr. Schonfeld") at the Olympia Fields Osteopathic Medical Center. On the basis of these examinations, Dr. Schonfeld diagnosed Mr. Schmaltz as having RADS.

On September 27, 1991, Mr. Schmaltz brought this action against N & W under the Federal Employers' Liability Act alleging that his condition was proximately caused by his exposure to the herbicides in the Calumet Yard. At trial, Mr. Schmaltz intends to introduce the expert testimony of Drs. Hessl and Schonfeld that exposure to either atrazine or tebuthiuron caused his present condition. N & W moves to bar the expert testimony of Drs. Dunlap, Hessl, and Schonfeld pursuant to FED.R.EVID. 702.[1]

### Analysis

Under the Federal Rules of Evidence, "[p]reliminary questions concerning ... the admissibility of evidence shall be determined by the court." FED.R.EVID. 104(a); see also Bradley v. Brown, 42 F.3d 434, 436 (7th Cir.1994) ("[i]t is well established that issues related to expert opinion testimony are matters of law to be determined by the trial judge") (citations omitted). The proponent of the proffered expert testimony, i.e. Mr. Schmaltz in the present case, bears the burden of establishing its admissibility by a preponderance of proof. Bradley v. Brown, 852 F.Supp. 690, 697 (N.D.Ind.), aff'd., 42 F.3d 434 (7th Cir.1994) (citation omitted); Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1316 (9th Cir.1995) ("the party presenting the expert must show that the expert's findings are based on sound science ..."). In determining whether Mr. Schmaltz has met his burden in this case, the Court is guided by FED.R.EVID. 702 and its construction by the U.S. Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., ——

1. Mr. Schmaltz has conceded that Dr. Dunlap may not testify as to her opinion on causation. See Plaintiff's Memorandum of Law in Response to Defendant's Motion, p. 3. Accordingly, the Court's analysis is limited to determining the admissibility of the proffered testimony from Drs. Hessl and Schonfeld.

U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

FED.R.EVID. 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

FED.R.EVID. 702. In construing this rule, the U.S. Supreme Court explained that "the adjective 'scientific' implies a grounding in the methods and procedures of science" and "the word 'knowledge' connotes more than subjective belief or unsupported speculation." *Daubert v. Merrell Dow Pharmaceuticals, Inc., supra,* —— U.S. at ——, 113 S.Ct. at 2795 (citation omitted). Accordingly, a trial judge faced with a proffer of expert scientific testimony

must determine at the outset ... whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

*Id.* at ——, 113 S.Ct. at 2796. The Seventh Circuit has interpreted *Daubert* to require a two-step inquiry:

*Daubert* first "directs the district court to determine whether the expert's testimony pertains to scientific knowledge. This task requires that the district court consider whether the testimony has been subjected to the scientific method; it must rule out 'subjective belief or unsupported speculation.'" Second, the district court must "determine whether the evidence or testimony assists the trier of fact in understanding the evidence or in determining a fact in issue. That is, the suggested scientific testimony must 'fit' the issue to which the expert is testifying."

*O'Conner v. Commonwealth Edison Co.,* 13 F.3d 1090, 1106 (7th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 2711, 129 L.Ed.2d 838 (1994) (citing *Porter v. Whitehall Laborato-*

*ries, Inc.,* 9 F.3d 607, 613, 616 (7th Cir.1993)). Scientific evidence must meet both requirements to be admissible. *O'Conner v. Commonwealth Edison Co., supra,* 13 F.3d at 1106 n. 17.

■ *Daubert* sets forth a nonexhaustive list of criteria to assist courts in determining whether a theory or technique constitutes "scientific knowledge" within the meaning of FED.R.EVID. 702. Courts should consider whether the proffered theory (1) can be and has been empirically tested, (2) has been subjected to peer review and publication, and (3) follows from a technique which has been generally accepted in the relevant scientific community. *Daubert v. Merrell Dow Pharmaceuticals, Inc., supra,* —— U.S. at —— ——, 113 S.Ct. at 2796–97; *Porter v. Whitehall Laboratories, Inc., supra,* 9 F.3d at 613. Another relevant consideration is "whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." *Daubert v. Merrell Dow Pharmaceuticals, Inc., supra,* 43 F.3d at 1317.

■ The most important factor in the *Daubert* analysis is whether the proffered scientific theory can be and has been tested by the scientific method. *Bradley v. Brown, supra,* 42 F.3d at 438; *Stanczyk v. Black & Decker, Inc.,* 836 F.Supp. 565, 567 (N.D.Ill. 1993). "Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified." *Daubert v. Merrell Dow Pharmaceuticals, Inc., supra,* —— U.S. at ——, 113 S.Ct. at 2796 (citation omitted). Accordingly, a scientific theory that is not supported by appropriate validation is not admissible under FED. R.EVID. 702. *Id.* at ——, 113 S.Ct. at 2795. Courts must exclude "subjective belief or unsupported speculation." *Porter v. Whitehall Laboratories, Inc., supra,* 9 F.3d at 614 (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc., supra,* —— U.S. at ——, 113 S.Ct. at 2795).

On the record before me, the theory that either atrazine or tebuthiuron caused Mr. Schmaltz's present condition has not been

supported by sufficient validation to satisfy the *Daubert* test. Dr. Hessl acknowledges that he knows of no documented cases in which exposure to atrazine caused RADS. *See* Deposition of Dr. Hessl ("Hessl Dep."), p. 141. Nevertheless, he believes that there is some evidence to suggest that atrazine might have caused Mr. Schmaltz's condition. Hessl Dep., p. 141. He concedes that the evidence is "not terribly strong;" indeed, the only evidence upon which he relies in rendering this opinion are uncited studies in which high doses of atrazine caused eye irritation in rabbits. Hessl Dep., pp. 108, 142.

This evidence is insufficient to sustain a scientific opinion under *Daubert*. Dr. Hessl refers only to the general nature of the studies in his deposition testimony and Mr. Schmaltz fails to include abstracts of these studies or the studies themselves in the supporting materials he submits in opposition to the motion. Consequently, the Court is unable to draw its own inferences from them. Moreover, Dr. Hessl testified that the concentration of atrazine would have had to be "fairly high," *i.e.* greater than the OSHA Permissible Exposure Limit ("OSHA PEL") of 5 milligrams per cubic meter, to trigger Mr. Schmaltz's condition, yet he concedes that he never tested Mr. Schmaltz for exposure to atrazine and that he is unaware of the concentration to which Mr. Schmaltz was allegedly exposed. Hessl Dep., pp. 142–43, 148–49. Accordingly, the basis for Dr. Hessl's opinion is dubious in light of Mr. Schmaltz's own testimony that he was not present at the time of the spraying and that he never directly touched atrazine while working in the Calumet Yard, and N & W's uncontroverted evidence that the air concentration of atrazine at the time of the alleged exposure must have been well below the OSHA PEL. *See* Deposition of Mr. Schmaltz ("Schmaltz Dep."), pp. 275, 351; Affidavit of Dr. Charles E. Becker ("Becker Aff."), ¶¶ 34–36; Affidavit of Dr. Stuart M. Brooks ("Brooks Aff."), ¶¶ 32–37; Affidavit of Dr. Everett R. Cowett ("Cowett Aff."), ¶¶ 41, 72–74. *Accord, Chikovsky v. Ortho Pharmaceutical Corp.,* 832 F.Supp. 341, 345–46 (S.D.Fla.1993) (testimony excluded where expert did not know how much Retin–A, a Vitamin A derivative used for acne treat-ment, was absorbed by the plaintiff; did not know the dosage level at which Vitamin A becomes unsafe for pregnant women; and failed to compare dose of Vitamin A in published studies with that present in Retin–A).

In short, the record before me fails to make clear why the incidence of eye irritation in rabbits exposed to high doses of atrazine could reasonably lead a doctor to conclude that an indirect exposure to atrazine could cause pulmonary or respiratory conditions in humans. "The analytical gap between the evidence presented and the inferences to be drawn on the ultimate issue ... is too wide" in the present case. *Conde v. Velsicol Chemical Corp.,* 24 F.3d 809, 814 (6th Cir.1994) (quoting from *Turpin v. Merrell Dow Pharmaceuticals, Inc.,* 959 F.2d 1349, 1360 (6th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 84, 121 L.Ed.2d 47 (1992)).

■ Dr. Schonfeld also testified that he knows of no documented cases in which atrazine or tebuthiuron caused RADS. *See* Deposition of Dr. Schonfeld ("Schonfeld Dep."), pp. 125–26. Dr. Schonfeld admits that he lacks knowledge of the nature and structure of these herbicides, and acknowledges that his RADS diagnosis is based on the temporal congruity between Mr. Schmaltz's alleged exposure and the onset of his symptoms. Schonfeld Dep., pp. 35–36, 128. It is well settled that a causation opinion based solely on a temporal relationship is not derived from the scientific method and is therefore insufficient to satisfy the requirements of FED.R.EVID. 702. *See, e.g., Porter v. Whitehall Laboratories, Inc., supra,* 9 F.3d at 611 (expert testimony of two doctors excluded where their opinions were based solely on the temporal relationship between the ingestion of ibuprofen and injury); *Conde v. Velsicol Chemical Corp.,* 804 F.Supp. 972, 1023 (S.D.Ohio 1992), *aff'd.,* 24 F.3d 809 (6th Cir.1994) (expert testimony based solely on a temporal relationship between exposure to insecticide and injury excluded where there was no medical evidence of causation); *Daubert v. Merrell Dow Pharmaceuticals, Inc., supra,* 43 F.3d at 1319.

■ In summary, neither Dr. Hessl nor Dr. Schonfeld has come forward with suffi-

cient empirical support for his causation opinion. They have neither performed nor identified any studies of the effects of atrazine or tebuthiuron on the pulmonary· or respiratory system of humans, nor have they adequately demonstrated how animal studies involving atrazine support their conclusions.

Peer review of a scientific theory is a significant consideration under *Daubert* because "scrutiny of the scientific community is a component of 'good science,' in part because it increases the likelihood that substantive flaws in methodology will be detected." *Daubert v. Merrell Dow Pharmaceuticals, Inc., supra,* —— U.S. at ——, 113 S.Ct. at 2797. In the present case, neither doctor cites any studies published in the scientific or medical literature that links atrazine or tebuthiuron to RADS or any other respiratory or pulmonary condition. The absence of any such studies in the literature is particularly glaring in light of the fact that atrazine and tebuthiuron have been extensively used for weed control in agricultural and other areas for over 34 and 20 years, respectively. *See* Cowett Aff., ¶¶ 14–15, 46.

Contrary to the opinions of Drs. Hessl and Schonfeld, the scientific literature indicates that there is no evidence of any health hazards associated with human exposure to atrazine or tebuthiuron. For example, the World Health Organization has concluded that, although atrazine has been used for weed control since 1958, "there are no substantiated indications that atrazine causes any health or safety hazards for the general population or for exposed workers." Becker Aff., Ex. F. The Handbook of Pesticide Toxicology states that "atrazine is a compound of low acute toxicity" and that "there have been no substantiated cases of acute poisonings in humans from the ingestion of atrazine." Becker Aff., Ex. B. The Herbicide Handbook of the Weed Science Society of America found that "[n]o observable ill effects were detected in cattle, dogs, horses or rats fed a diet which included more than 25 ppm atrazine over extended periods," and that "[t]wo-year feeding studies, in which male and female rats were given daily dosages of atrazine at various levels, showed no gross or microscopic signs of toxicity due to ingestion of levels as high as 100 ppm in the total diet." Becker Aff., Ex. D. The Material Safety Data Sheet on Atratol 90, the herbicide containing atrazine used by N & W, states that "[l]ong-term exposure to low levels of Atrazine is not known to cause any chronic ill effects in humans." Becker Aff., Ex. E. The Poisindex Toxicology Report, an on-line service used by the medical community for assistance in the identification and treatment of poisonings in humans, reports that "ingestion of atrazine 800 mg in a child and 4 mg/kg in an adult have resulted in no reported toxicity" and that "[m]inimal human data reported to manufacturers have not shown any adverse effects." Becker Aff., Ex. J.

With respect to tebuthiuron, the U.S. Environmental Protection Agency ("EPA") has stated that acute toxicity studies indicate that tebuthiuron is "practically non-toxic by the dermal route ..., and only slightly toxic by the inhalation route" and that the occupational risks stemming from dermal and inhalation exposure to tebuthiuron are "considered to be minimal due to its low toxicity." Affidavit of Dr. Abba I. Terr ("Terr Aff."), Ex. K, pp. v–vi. Accordingly, the EPA has concluded that "tebuthiuron products, labeled and used as specified in [the EPA's] Reregistration Eligibility Decision, will not pose unreasonable risks or adverse effects to humans or the environment." Terr Aff., Ex. K, p. 36. The Material Safety Data Sheet on Spike 80W, the herbicide containing tebuthiuron used by N & W, reports no respiratory or pulmonary effects in laboratory animals after acute exposures to the herbicide. Becker Aff., Ex. M. In chronic toxicity studies, "where experimental dosage levels and durations of exposure were far in excess of those likely to occur in humans," the effects of tebuthiuron were limited to growth retardation, reversible vacuolization of pancreatic cells, and increased spleen weights. Becker Aff., Ex. M. No effects on respiratory or pulmonary functions were revealed. The Poisindex Toxicology Report states that there is

> "[i]nsufficient data in the literature to accurately assess the minimal toxic or lethal dose [of urea-substituted herbicides, including tebuthiuron].... On the basis of animal studies these agents appear to have

a low order of systemic toxicity.... If severe symptoms or signs of poisoning are evident, other than methemoglobinemia, the operation of an alternative or additional toxicant should be suspected."

Becker Aff., Ex. N. Clearly, the relevant scientific and medical literature does not support the opinions of Drs. Hessl and Schonfeld.

### Conclusion

Mr. Schmaltz has failed to demonstrate that the opinions of Drs. Dunlap, Hessl, and Schonfeld concerning the causes of his condition are grounded in the scientific method.[2] Consequently, the testimony of Drs. Dunlap, Hessl, and Schonfeld is not admissible under FED.R.EVID. 702 and *Daubert.* N & W's motion is granted.

---

2. Accordingly, the court need not employ the second prong of the *Porter* test, *i.e.* whether there is a proper fit between the methodology used and the facts presented. *See O'Conner v. Commonwealth Edison Co., supra,* 13 F.3d at 1107 n. 20.