**Jill EDWARDS, as Personal Representative of the Estate of Mark Edwards, deceased; for the benefit of decedent's Estate and his survivor, Jill Edwards, individually, Plaintiff,**

v.

**SAFETY–KLEEN CORPORATION, Defendant.**

**No. 97–7180–CIV.**

United States District Court, S.D. Florida, Miami Division.

Sept. 7, 1999.

---

Robert C. Maland, Robert C. Maland, P.A., Miami, FL, Richard Cordry, Morristown, NJ, for plaintiff.

J. Truscott Jones, The Jones Law Firm, LLP, Dallas, TX, Paula Kessler, Catri, Holton & Kessler & Kessler, P.A., Fort Lauderdale, FL, for defendant.

## OMNIBUS ORDER

SEITZ, District Judge.

THIS CAUSE came before the Court upon the parties' respective objections to the admission of certain expert testimony in this case, as well as upon various other pending motions.

### BACKGROUND

This is a wrongful death case. Plaintiff alleges that the decedent's death (from myelodysplastic syndrome—or "MDS"—a disease of the bone marrow and blood) was due to his workplace exposure to the chemical benzene while using Defendant's product, SK–105, a machine parts cleaner. To succeed on this claim, Plaintiff will have to present evidence at trial showing: (a) that the decedent was exposed to benzene in the workplace; (b) that the benzene was from the Defendant's product; (c) that benzene can cause MDS; and (d) that the decedent's exposure to benzene found in Defendant's product was in fact the cause of his MDS.[1] Each party has proffered expert witnesses to either prove or rebut these elements, and each now seek to have the Court exclude the opposing party's proffered expert witnesses from testifying on these issues, based upon *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and its progeny.

### ANALYSIS

1. *Standards for Admissibility of Expert Testimony.*

■■■ Pursuant to Rule 702 of the Federal Rules of Evidence,

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may

**1.** *See, e.g., Allen v. Pennsylvania Eng'g Corp.,* 102 F.3d 194, 199 (5th Cir.1996) ("Scientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case.").

testify thereto in the form of an opinion or otherwise.

In order for expert testimony to be admissible, however, the testimony must be both relevant and reliable. *Daubert,* 509 U.S. at 589, 113 S.Ct. 2786. "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93, 113 S.Ct. 2786. Key factors in making this assessment include the following:

(1) whether the theory or technique upon which the testimony is based can be (and has been) tested;

(2) whether there is a high known or potential rate of error associated with the technique, and whether there are standards controlling the technique's operation;

(3) whether the theory or technique has been subjected to peer review and publication; and

(4) whether the theory or technique is generally accepted in the relevant scientific community.

*Id.* at 593–94, 113 S.Ct. 2786. "[T]he test of reliability is 'flexible,' and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 1171, 143 L.Ed.2d 238 (1999). "[T]he proponent of this testimony, bears the burden of establishing the admissibility of the proffered expert testimony." *Haggerty v. Upjohn Co.,* 950 F.Supp. 1160, 1162 (S.D.Fla.1996), *aff'd,* 158 F.3d 588 (11th Cir.1998).

### 1. *Dr. Melvyn Kopstein.*

■ Plaintiff has proffered Dr. Kopstein as an expert witness on the critical issue of the amount of benzene exposure the decedent would have received while using the SK–105 product. Defendant seeks to exclude Dr. Kopstein's expert opinion on the grounds that the methodology used is not sufficiently reliable to satisfy the requirements of Federal Rule of Evidence 702, *Daubert,* and *General Electric v. Joiner,* 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). Upon review of the motion, response and reply memoranda, and the exhibits attached to each, the Court agrees for the reasons set forth below.

■ First, the Court notes that, in response to Defendant's objections to his testimony, Dr. Kopstein provides his own affidavit, stating that his "scientific methodologies meet the standards of appropriate exposure assessment generally accepted in the scientific community and that [his] calculations of Mr. Edwards' exposure to benzene from his use of SK–105 are accurate and conservative." Despite Dr. Kopstein's self-acclamation in this regard, " 'nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.' " *Kumho Tire,* 526 U.S. at ——, 119 S.Ct. at 1179 (quoting *Joiner,* 522 U.S. at 146, 118 S.Ct. 512). Hence, the Court must look for other, more objective indicia of reliability in the record regarding Dr. Kopstein's proposed testimony.

Dr. Kopstein also stresses his credentials as a scientist, and relies heavily on the fact that the models relied upon in reaching his conclusions are standard, well-established, and previously tested principles. The Court does not doubt Dr. Kopstein's credentials.[2] The Court also does not doubt that Dr. Kopstein employed standard textbook formulae in reaching his conclusions. The Court does take issue with, however, Dr. Kopstein's methodology—i.e., the assumptions made and data relied upon in applying the "textbook models" to the facts of this case, as well as the intermingling of well-established formulae in order to reach a particular conclusion. Stated differently, the issue here is, given the facts of the instant case, whether Dr.

---

**2.** As to Dr. Kopstein's status as a "professional expert witness," the Court finds that this fact goes to the weight, not the reliability, of his testimony.

Kopstein has applied those models in a manner that ensures a sufficiently reliable opinion to assist the jury in its factual determination. Indeed, " '[f]it' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Daubert,* 509 U.S. at 591, 113 S.Ct. 2786.

Here, the Court initially finds that Dr. Kopstein's applications ignore basic science principles and, as such, are not based on sound science. For instance, Dr. Kopstein has not addressed to the Court's satisfaction the issues of lateral diffusion, mass versus volume, and measurement of air flow. The Court finds such factors critical to providing an indicia of reliability with respect to the methodology employed by Dr. Kopstein. Second, the Court can find no indication in the record that Dr. Kopstein's approach of applying a standard formula or combination of formulae in the manner outlined in his affidavit is in fact followed by other experts in the industry. Nor is there any reference to articles or papers that validate his approach. His reliance on course and seminar outlines teaching the underlying basic models is misplaced. As previously noted, it is the application and interplay of those models that is relevant.

In conclusion, the Court finds that the methodology employed by Dr. Kopstein is neither scientifically reliable nor has it been subjected to an objective, independent evaluation or confirmation. Moreover, Plaintiff has failed to proffer any other reasonable indicia of reliability upon which the Court could find a basis to admit Dr. Kopstein's testimony. Again, it is *Plaintiff's* burden to prove the reliability of the proffered testimony. Accordingly, Dr. Kopstein shall not be permitted to testify as an expert witness.

### 2. *Dr. Susan Daum.*

■ Plaintiff further seeks to admit the expert testimony of Dr. Daum (a spe-

cialist in the field of environmental and occupational medicine) on the issue of causation, i.e., whether the decedent's MDS was caused by exposure to benzene. Specifically, Dr. Daum is expected to testify that, given the level of benzene exposure in the SK–105 product used by the decedent, *as calculated by Dr. Kopstein,* it is her opinion that the decedent's MDS was caused by that exposure.[3] Because the Court has found Dr. Kopstein's conclusions as to exposure level to be unreliable, however, Dr. Daum's conclusions as to *causation* are suspect and, therefore, are likewise inadmissible. *See, e.g., Christophersen v. Allied–Signal Corp.,* 939 F.2d 1106, 1114–15 (5th Cir.1991) (*en banc*), *cert. denied,* 503 U.S. 912, 112 S.Ct. 1280, 117 L.Ed.2d 506 (1992) (holding that the district court did not abuse its discretion in excluding expert's opinion that was based on insufficient data regarding the dosage of a harmful substance and the duration of exposure to that substance). However, the Court shall permit Dr. Daum to testify generally regarding benzene as a leukemogenic agent, as the Court finds that such testimony may be potentially helpful to the trier of fact in deciding this case.

### 3. *Dr. Mounzer Agha.*

■ Plaintiff also proffers as an expert witness Dr. Agha (an oncologist and hematologist), the treating physician who conducted the decedent's bone marrow transplant. In addition to testifying about the facts surrounding the diagnosis and treatment of the decedent, Dr. Agha is also expected to testify as to causation; i.e., that the decedent's MDS was caused by his exposure to benzene.

In his deposition testimony, Dr. Agha states that "in the best of my clinical abilities as a physician, when I encounter a patient with a myelodysplastic syndrome, high grade myelodysplastic syndrome like

---

**3.** Dr. Daum apparently did not consider other possible causes of the decedent's MDS in reaching her causation conclusion. The Court finds, however, that such a fact would go to the weight of the evidence and not its admissibility.

Mr. Edwards had, or acute myelogenous leukemia and [who] had any kind of benzene exposure, it would make me think that the benzene exposure must have contributed to the development of his leukemia. And that would be my opinion if I know that Mr. Edwards had been exposed to benzene." (Emphasis added). Dr. Agha further stated that he "can make [such] a generalized statement based on the ample evidence in the literature."

■ With respect to the decedent specifically, however, Dr. Agha admits that, although he was aware that the decedent had been exposed to solvents and part cleaners in the workplace, he did not know what the chemicals were in those products and does not know if, in fact, the decedent had been exposed to benzene in particular. He also concedes that, in order to link the cause of the decedent's MDS with a specific exposure or specific product, an in-depth epidemiologic study would need to be done. Moreover, Dr. Agha is not aware of any studies which define the minimum level of exposure to benzene (either as to amount or duration) necessary to be toxic (and, in any event, he admits that toxicology is not his field of expertise). Clearly, therefore, it would be inappropriate for Dr. Agha to conclude that the decedent's MDS was *in fact* caused by benzene exposure, and the Court will not permit such speculative testimony. The Court shall permit Dr. Agha to testify generally, however, as to benzene as a leukemogenic agent, finding that the Defendant's objections in this respect go to the weight of the evidence and not its reliability.

### 4. *Dr. Harvey M. Golomb.*

Defendant has proffered as an expert witness Dr. Golomb, an oncologist, who will opine that, because the decedent's cytogenetic studies indicated a normal karyotype and did not indicate any breakage of chromosomes 5 and 7, his MDS could not have resulted from exposure to benzene. Dr. Golomb bases his opinion on certain medical literature reporting various chemotherapy-induced cytogenetic changes and on his own involvement in studies comparing cytogenetic changes in persons with chemotherapy-induced leukemia to those in persons with leukemia arising from some other unknown cause. From the conclusions drawn in those studies, and from other medical literature linking benzene with leukemia, Dr. Golomb extrapolates his theory that the decedent could not have a benzene-induced leukemia because he did not exhibit chromosomal aberrations which are similar to chemotherapy-induced chromosomal aberrations.

By Dr. Golomb's own admission, however, the literature he relied upon does not state with any degree of medical certainty that, absent abnormalities in chromosomes 5 or 7, it is very unlikely that the MDS or leukemia was caused by exposure to benzene. Rather, all of the literature in this regard is merely "suggestive" of that conclusion. Dr. Golomb concedes that this hypothesis has never been tested and that there is no direct evidence to support the theory that benzene will affect the human body in the same manner as chemotherapy. In fact, Dr. Golomb has no knowledge of any paper that compares benzene-induced leukemia with chemotherapy-induced leukemia. Dr. Golomb just "believes" that "maybe it does act the same way." And, although Dr. Golomb cites to one recent study that has found abnormalities in chromosomes 5 and 7 in people who do not have MDS or leukemia, but who have been exposed to benzene, he nevertheless admits that the study did not look at any other chromosomes. Further, Dr. Golomb concedes that up to 40 percent of people who develop MDS may not have *any* chromosomal abnormalities at all, and some people (albeit a small percentage) exhibit abnormalities in other chromosomes. Moreover, Dr. Golomb has never himself treated leukemia (or leukemia-related) cases involving exposure to benzene.

Based on all of these factors, the Court concludes that none of the *Daubert* factors have been sufficiently established to permit such testimony to go to the jury. Specifically, the Court finds that Dr. Golomb's

theory has not been tested and, because it is untested, has no known or acceptable rate of error. Nor has Dr. Golomb's theory been subjected to peer review. Absent such factors, the Court does not see how Dr. Golomb can support his conclusory relationship between benzene-related and chemotherapy-related MDS or leukemia. In other words, Dr. Golomb has not established a scientific link or "good grounds" for his assertion that the decedent could not have had a benzene-induced MDS because he did not exhibit chromosomal aberrations which are similar to chemotherapy-induced chromosomal aberrations.

█ Just as fatal is Defendant's failure to establish whether Dr. Golomb's theory is *generally accepted* in the relevant scientific community. At best, the literature and hypotheses put forward by Dr. Golomb show a *possibility* of *future* general acceptance, providing that future testing can confirm Dr. Golomb's theory. Until that point in time, however, the theory is not scientifically reliable and will therefore be excluded at the trial of this matter. *See Daubert*, 509 U.S. at 590, 113 S.Ct. 2786 (as part of its "gatekeeping" responsibilities, the court must rule out "subjective belief or unsupported speculation"). *See also Porter v. Whitehall Labs., Inc.*, 9 F.3d 607 (7th Cir.1993) (proposed expert's testimony excluded where there were no scientific studies or data supporting her opinion that decedent's condition was caused by his ingestion of ibuprofen).

## CONCLUSION

Based upon the foregoing analysis, and upon a complete review of the record, it is hereby

ORDERED that:

(1) Defendant's Objection to the Admissibility of the Proposed Testimony of Melvin Kopstein, Ph.D., filed February 12, 1999 [D.E. No. 65], and deemed to be a motion in limine, is GRANTED. Plaintiff's expert witness, Dr. Kopstein, shall not be permitted to testify at the trial of this matter.

(2) Defendant's Objection to the Admissibility of the Proposed Testimony of Mounzer Agha, M.D., filed February 12, 1999 [D.E. No. 66], and deemed to be a motion in limine, is GRANTED IN PART. Plaintiff's expert witness, Dr. Agha, shall not be permitted to testify at the trial of this matter on the issue of causation.

(3) Defendant's Objection to the Admissibility of the Proposed Testimony of Susan Daum, M.D., filed February 12, 1999 [D.E. No. 67], and deemed to be a motion in limine, is GRANTED IN PART. Plaintiff's expert witness, Dr. Daum, shall not be permitted to testify at the trial of this matter on the issue of causation.

(4) Plaintiffs' Motion in Limine to Exclude Certain Testimony from Harvey M. Golomb, M.D., filed February 16, 1999 [D.E. No. 68], is GRANTED. Defendant's expert witness, Dr. Golomb, shall not be permitted to testify at the trial of this matter on the issue of causation.

(5) Plaintiffs' Motion for Sanctions Against Defendant and For Continuance of Trial, filed February 19, 1999 [D.E. No. 71], is DENIED as to sanctions and DENIED AS MOOT as to the continuance.

(6) Defendant's Motion to Strike Plaintiff's Response to Defendant Safety-Kleen's Objections to Admissibility of Proposed Testimony of Melvyn Kopstein, Ph. D., Susan Daum, M.D., and Mounzer Agha, M.D., filed February 25, 1999 [D.E. No. 87], is DENIED.

(7) Plaintiff's Motion to Strike References to Steven H. Lamm, M.D. and Otto Wong, Sc.D and Corresponding Affidavits, filed March 1, 1999 [D.E. No. 93], is DENIED.

(8) Defendant's Motion for Leave to File Rejoinder in Opposition to Plaintiff's Motion for Sanctions and For Continuance, filed March 2, 1999 [D.E. No. 97], is GRANTED.

(9) Plaintiff's Motion for Consideration of Response Affidavit of Susan M. Daum, M.D., filed March 4, 1999 [D.E. 100], is GRANTED.

(10) Plaintiffs' Second Motion for Sanctions, filed March 8, 1999 [D.E. No. 103], is DENIED.

(11) Defendant's Motion to Strike Plaintiff's Response to Defendant Safety–Kleen's Motion in Limine, filed March 8, 1999 [D.E. No. 104], is DENIED.

DONE AND ORDERED.