Gary **MUZZEY** and **Cynthia Muzzey**, as parents and next friends of April Muzzey, a minor, and Patricia Bryan, Individually and as Special Administrator of the Estate of Stephanie Bryan, deceased, and Dennis Bryan, Individually, Plaintiffs,

v.

**KERR–McGEE CHEMICAL CORPORA-TION,** a Delaware Corporation and Kerr–McGee Corporation, a Delaware Corporation, Defendants.

No. 93 C 3623.

United States District Court,
N.D. Illinois,
Eastern Division.

March 26, 1996.

Patrick J. Kenneally, Thomas Louis Trinley, Shawn A. Warner, Patrick J. Kenneally, Ltd., Chicago, IL, for April Muzzey, Dennis Bryan, Patricia Bryan.

Michael P. Connelly, Thomas F. Tobin, Patrick G. Donnelly, Eugene Stuart Kraus, Anthony John Bruozas, Stephanie Ann Lackritz, Charles Patrick Piacentini, Jr., Connelly & Schroeder, Chicago, IL, James A. Goold, Peter J. Nickles, Elliott Schulder, Coleman S. Hicks, Alan A. Pemberton, Covington & Burling, Washington, DC, Tracy A. Thomas, Covington & Burling, Washington, DC, for Kerr–McGee Chemical Corporation.

Patrick G. Donnelly, Connelly & Schroeder, Chicago, IL, James A. Goold, Tracy A. Thomas, Covington & Burling, Washington, DC, for Kerr–McGee Corporation.

## *MEMORANDUM OPINION AND ORDER*

BUCKLO, District Judge.

Before the Court is defendants' motion to bar the expert testimony of Drs. Demopoulos, Radford, and Tai pursuant to Federal Rule of Evidence 702. For the reasons stated herein, defendants' motion is granted in part.[1]

---

1. The motion is granted with respect to the causation experts for April Muzzey. The three experts may not testify regarding her case. The motion is entered and continued with respect to the causation experts for Stephanie Bryan, pending an evidentiary hearing to determine whether the linear no-threshold hypothesis is admissible to prove that even low doses of radiation may cause osteogenic sarcoma. With respect to the testimony of Marvin Resnikoff, the motion is entered and continued, pending decision on the admissibility of the testimony of Bryan's causation experts.

## Facts

April Muzzey was born in 1980 and moved to West Chicago, Illinois in 1986. In 1990, Muzzey's doctors observed an overabundance of red blood cells in her body, a condition known as erythrocytosis. Muzzey contends that she therefore has a disease called polycythemia vera ("PV").[2] PV is "[a] chronic myeloproliferative disorder of unknown cause characterized by an increase in [hemoglobin] concentration and [erythrocytosis]." THE MERCK MANUAL 1189 (Robert Berkow et al. eds., 16th ed. 1992).[3]

For decades, the West Chicago Rare Earths Facility refined monazite ore in order to remove thorium from it.[4] The by-product of this refining process was a sand-like material, called tailings, which retained some thorium. These tailings were dumped in Reed–Keppler Park in West Chicago. While living in West Chicago, Muzzey played in this park. Defendants Kerr–McGee and Kerr–McGee Corp. (collectively, "Kerr–McGee") now own the refining facility. Muzzey has brought this suit alleging that radiation from thorium tailings caused her to contract PV.

Kerr–McGee disagrees that the thorium tailings caused Muzzey's illness. They argue that the plaintiffs cannot prove that radiation causes PV or that Muzzey even has PV. They assert that Muzzey has secondary erythrocytosis which, unlike PV, is not fatal.[5] The defendants contend that Muzzey's tests reveal an elevated level of the hormone erythropoietin ("EPO"), which is inconsistent with a diagnosis of PV.[6] Moreover, neither Muzzey's present treating physician, nor the Mayo Clinic specialists who have examined her, diagnoses Muzzey's illness as PV.[7] The distinction between the two possible afflictions is crucial to Muzzey's case, for although the parties dispute whether radiation is capable of causing PV, neither party contends that radiation can cause secondary erythrocytosis.

In June of 1995, the defendants moved to exclude the plaintiffs' experts from testifying. Counsel for the plaintiffs subsequently sent each expert a letter, requesting him to address Kerr–McGee's arguments.[8] Attached to their response brief, the plaintiffs then submitted "Rebuttal Reports" from each expert. In these "Rebuttal Reports," the experts attempted to address the claimed flaws in their testimony. Throughout this opinion, I refer to the experts' initial reports as their "Rule 26 reports" and to their "Rebuttal Reports" as their "supplemental reports."

## The Experts

At trial, the plaintiffs intend to introduce the expert testimony of Drs. Demopoulos, Radford, and Tai. All three witnesses will testify that radiation from the thorium tailings caused Muzzey to contract PV.

### Harry Demopoulos

According to his deposition testimony, Harry Demopoulos is a pathologist who testi-

2. In 1990, Muzzey's then-treating physician, Dr. Suarez, diagnosed her illness as PV. Muzzey's present treating physician, Dr. Kovach, does not think she has PV.

3. The Merck Manual defines myeloproliferative disorders as "[a] group of disorders characterized by abnormal proliferation by 1 or more hematopoietic cell lines or connective tissue elements." The family of myeloproliferative disorders includes PV, myelofibrosis, chronic myelogenous leukemia, and primary thrombocythemia.

4. Thorium is a radioactive element—it decays into "daughters," releasing alpha particles as it does so. These alpha particles are radioactive.

5. If a patient has secondary erythrocytosis, her excess of red blood cells usually is caused by the overproduction of the hormone erythropoietin.

See HARRISON'S PRINCIPLES OF INTERNAL MEDICINE 1760 (Kurt J. Isselbacher et al., eds., 13th ed. 1994)

6. EPO is the hormone that ordinarily regulates red blood cell production. It is secreted by the kidney and possibly by other tissues, and can be detected in human plasma and urine. STEDMAN'S MEDICAL DICTIONARY 487 (William H.L. Dornette ed., 5th ed. 1982).

7. As discussed below, the defendants also contend that Muzzey's blood tests revealed elevated hemoglobin levels even before she moved to West Chicago.

8. The letter explained that "[t]hese propositions [the flaws pointed out by the defendants] must be rebutted by, at least, a plausible explanation and, if possible, with citations to the scientific literature."

fies regularly in litigation matters.[9] He is an associate professor at New York University School of Medicine, but does not teach classes or conduct research there. He has conducted no academic research on PV, although he has performed and published research on the hormone EPO and its production. He has never acted as a primary care physician for a patient with PV or any other myeloproliferative disease. Outside this case, he has never been asked to provide an expert opinion about the causes of PV. He admits that he is not an expert in hematology.

Dr. Demopoulos has never spoken with Muzzey's father or her treating physicians. He spoke with Muzzey's mother once, but only after he had formed his opinion and submitted his Rule 26 report. He did not examine Muzzey's blood or marrow studies and admits that he has not independently diagnosed Muzzey's illness.

Dr. Demopoulos opines that radiation from the thorium tailings caused Muzzey to contract PV. Dr. Demopoulos finds it "unlikely that April Muzzey could have had her disease induced by anything other than radiation." Moreover, he admits that no matter how little radiation Muzzey is proven to have received, he would still think that radiation caused her disease.

Dr. Demopoulos' Rule 26 report for Muzzey is filled with extraneous statements that have little scientific backing or relevance. For example, he states that alpha emitters (such as thorium) "are especially efficient producers of cancers." PV, however, is not cancer. He also states that "[i]t is well known that sub-microscopic quantities of Thorium–232 and its decay chain are dangerous." Again, however, he does not explain how this statement supports his opinion that PV may be caused by radiation.

### Edward Radford

Edward Radford graduated from Harvard Medical School in 1946. He is an environ-

mental epidemiologist who spent several years in academia, teaching classes and conducting research on the effects of radiation. He was also Chairman of the Committee on the Biological Effects of Ionizing Radiation, which published a report of its findings in 1980, called the BEIR III report. From 1983 to 1984, he visited at the Radiation Effects Research Foundation in Hiroshima, Japan. There he assisted in epidemiological studies of survivors of the atomic bombs dropped on Hiroshima and Nagasaki.

Although Dr. Radford purported to independently diagnose Muzzey with PV, he has no expertise in hematology. He has never treated anyone with PV or published anything about it. Although he claims to have reviewed all of Muzzey's medical records, at his deposition he did not remember that she had been examined at the Mayo Clinic.[10] He has never spoken to Muzzey, her parents, or any of the physicians who examined Muzzey.

### Henry Tai

Unlike Drs. Radford and Demopoulos who have little expertise in hematology, Henry Tai is a medical doctor with some expertise in hematology, though he is not board certified in it.[11] He has published no articles on PV and has never been asked to provide an expert opinion on it. Although he has treated patients with PV, he has never met or examined Muzzey.

### Is the Expert Testimony based on Scientific Knowledge?

As a preliminary matter, I note that the plaintiffs must prove both general and specific causation. See, e.g., Wade–Greaux v. Whitehall Laboratories, Inc., 874 F.Supp. 1441, 1475 (D.V.I.1994) (citing DeLuca, by DeLuca v. Merrell Dow Pharmaceuticals, Inc., 911 F.2d 941, 958 (3rd Cir.1990)), aff'd, 46 F.3d 1120 (3rd Cir.1994); Casey v. Ohio Medical Products, 877 F.Supp. 1380, 1382 (N.D.Cal.1995).

---

**9.** The plaintiffs do not offer any other description of Dr. Demopoulos, such as what medical school he attended or where he has practiced medicine.

**10.** In his supplemental report, Dr. Radford explained this ignorance by stating that the records

were voluminous and therefore he could not remember all the "details" at the deposition.

**11.** Like Dr. Demopoulos, Dr. Tai has not provided his educational and professional background.

### Can Radiation Cause PV?

Drs. Demopoulos, Radford, and Tai all opine that radiation can cause PV. Each witness puts forth several different bases to support his opinion that radiation can cause PV.

*Analogy to CML*

All three experts assert that because radiation exposure causes Chronic Myelogenous Leukemia ("CML"), another myeloproliferative disease, radiation exposure probably also causes all other myeloproliferative diseases, including PV.

Although each of the three witnesses agrees that the analogy from CML to PV provides a basis for his opinion that radiation can cause PV, they do not articulate similar reasons as to why this conclusion follows. For example, Dr. Tai assumes that because PV and CML are both called myeloproliferative disorders, they share the same etiology. Dr. Radford, however, states that all myeloproliferative diseases may not share the same etiology. Dr. Demopoulos similarly does not assume that all myeloproliferative disease share a similar etiology.[12]

### Studies

In their various reports, the experts refer to several "studies" allegedly showing a causal link between radiation and PV. Although none of these studies is an epidemological one, the experts believe these studies support their opinion that radiation exposure can cause PV.

*The Savannah River Cluster*

In forming their opinions that radiation can cause PV, all three expert witnesses expressed reliance on 1982 newspaper accounts of 25 cases of PV occurring near the Savannah River nuclear facility in South Car-

olina. In 1983, however, the newspaper reports were retracted.[13] A subsequent study confirmed only five cases of PV. All three experts have attempted to explain their reliance on this distorted data.

For example, when asked at his deposition whether he was relying on the Savannah River data to support his theory of a connection between radiation and PV, Dr. Radford admitted that "[t]he scientific basis of that connection [between radiation and PV] is poor, no question about it." When questioned a few minutes later whether the Savannah River data supported scientifically his proposition that PV is connected to radiation, Dr. Radford answered: "You say support scientifically. It does not do it scientifically. It supports it though."

Despite recognizing its lack of scientific validity, Dr. Radford stated his intention to reference the Savannah River data at trial. Additionally, Dr. Radford stated that he did not care whether the reports on Savannah River were accurate—he would still consider them in forming his opinion on a causal link between radiation and PV. He stated: "I would like to go on record as saying ... a cluster of cases that was described, *however accurately or inaccurately,* in the vicinity of the Savannah River plant, is still in my opinion a significant observation."

Following his deposition, after having had time to reflect on these questions, Dr. Radford repeated in his supplemental report that "[i]t is clear that now there is no 'scientific' evidence about PV from the Savannah River cluster." He maintained his reliance on these reports, however, noting that "[e]ven if only about 10 cases of PV were eventually confirmed out of the group of 25, this would be a highly significant excess of PV over a period of 20 years in the relatively small population at risk." Only five cases of PV

12. The defendants also point out that each study cited by the experts to establish that radiation can cause CML involved gamma particle radiation, rather than the alpha particle radiation emitted from the thorium tailings. Neither party explains to the court whether this distinction has any significance.

13. The retraction printed by the newspaper explained that "[o]f the 25 purported cases of polycythemia vera cited in last year's newspaper

series, as many as 14 patients were actually suffering from secondary polycythemia, a distinctly different and non-fatal blood ailment associated with oxygen deprivation resulting from various causes, including smoking cigarettes and living in high altitudes." The retraction also pointed out that "[t]he articles failed to specify a time frame for the 25 cases, which occurred over a period of years and in fact fell within national norms."

were actually confirmed. Recognizing the damaging effect of Dr. Radford's reliance on this data, plaintiffs' counsel proposed a "stipulation" at Dr. Radford's second deposition that Dr. Radford did not rely on the Savannah River data because it was incomplete. Dr. Radford agreed with this stipulation and "point[ed] out it is clear now that there is no scientific evidence about PV in Savannah River cluster."

Dr. Demopoulos has also disavowed his initial reliance on the Savannah River data. After submitting his Rule 26 report in which he expressed reliance on this data, at his deposition, Dr. Demopoulos withdrew his reliance on the Savannah River reports, asking that reference to it be "deleted" from his report. He testified that although he initially intended to rely on it, he "thought that [they] would have additional information to back up or to substantiate [it], but [they had] been unable to gather any substantiation for [it]." Although when he formed his opinion, he relied on this data, his subsequent renunciation of his reliance on it did not cause Dr. Demopoulos to change his opinion on the source of Muzzey's illness.

In contrast to Drs. Radford and Demopoulos, Dr. Tai chose at his deposition to continue relying on the Savannah River data. Although recognizing that only five of the cases (initially reported as 25) were actually PV, he still thought that this number was "suggestive" that radiation could cause PV. He admitted, however, that because he is not an epidemiologist, he had no idea whether the five cases presented an incidence rate with a statistical significance higher than the norm.

*The Veterans Tests*

In forming their opinion that radiation can cause PV, Drs. Tai and Radford also rely on two published reports concerning the incidence of PV among military personnel present during atmospheric nuclear tests during the 1940s and 1950s.[14] One is a study entitled "Polycythemia Vera Among Participants of a Nuclear Weapons Test," written by Glyn Caldwell and others, and published in 1984 in the Journal of the American Medical Association (hereinafter "the Caldwell study"). The other study is entitled "Sequential Development of Polycythemia Vera and Chronic Myelocytic Leukemia in a Patient Following Radiation Exposure from Nuclear Weapons Tests." It was written by J. Brice Weinberg and published in the American Journal of Medicine in 1989 (hereinafter "the Weinberg study").

The Caldwell study found two cases of PV and two cases of suspected PV observed out of 3,217 nuclear test witnesses.[15] Comparing the number of four PV cases to the expected number of PV cases based on 1965 data about the normal incidence rate of PV, Caldwell noted that "the frequency of polycythemia vera seems to be increased and is reported here." Caldwell did not conclude, however, that the increased occurrence of PV demonstrated a causal link between radiation and PV. He instead stated that "the small individual whole-body doses of radiation reported for these four participants make the association with ionizing radiation tenuous." *Id.*

After several criticisms from the scientific community,[16] Caldwell conceded that "the small number of cases and the lack of good age-specific incidence and mortality data make any conclusions uncertain."[17] He noted that his study did not establish a link between radiation and PV but only that "better-defined work needs to be done to clarify the relationship between polycythemia vera and radiation exposure." *Id.*

The Weinberg study, on which Drs. Radford and Tai purport to rely, is a case study in which Weinberg discussed a single case of PV out of 250,000 people witnessing nuclear

---

14. Although Dr. Demopoulos referred to these reports in his deposition, he did not rely on them in forming his opinion. He specifically stated that even without them his opinion would not change.

15. Caldwell did not have complete medical records for all four of these cases, but had only enough to concretely diagnose two cases of PV.

16. *See, e.g.,* Janet L. Sobell et al., *Letter to the Editor,* 257 J.Amer.Med.Ass'n 1179 (March 6, 1987).

17. Glyn G. Caldwell, *Letter in Reply,* 257 J.Amer. Med.Ass'n 1179 (March 6, 1987).

tests. In introducing his study, Weinberg states that veterans exposed to nuclear tests have an increased risk of contracting PV. He cites, however, only to the Caldwell study, and adds nothing. Moreover, his article purports to draw no conclusion about the link between radiation and PV. It focuses solely on the "unusual" case of a patient who contracted CML which subsequently developed into PV.

*Japanese Atomic Bomb Studies*

Dr. Tai has also expressed reliance on studies performed on survivors of the atomic bombs dropped on Hiroshima and Nagasaki, citing THE COMMITTEE FOR THE COMPILATION OF MATERIALS ON DAMAGE CAUSED BY THE ATOMIC BOMBS IN HIROSHIMA AND NAGASAKI, HIROSHIMA AND NAGASAKI: THE PHYSICAL, MEDICAL AND SOCIAL EFFECTS OF THE ATOMIC BOMBINGS (Ishikawa and Swain, trans.1981). Dr. Tai points to a study noted in the Committee's Compilation in which the incidence rate of PV among those present when the atomic bomb was dropped in Hiroshima was determined to be greater than the ordinary incidence rate in Japan.

In the same paragraph, however, the Committee also cites a later review of that study which confirmed only seven cases of PV (rather than the 17 originally counted), with all seven occurring in people who were exposed to the radiation far from the hypocenter of the explosion. The Committee therefore concluded that "there was no relation to exposure."[18] Moreover, Dr. Radford, the only witness of the plaintiffs who is an expert in epidemiology, discounts the quality of the Japanese studies. Dr. Radford is especially qualified to judge the Japanese A-bomb data because he spent 1985 as a visiting professor in Japan analyzing such data. He explicitly disagrees with Dr. Tai's contention that a causal relationship between radiation and PV had been shown by the Japanese studies. In his initial Rule 26 report, for instance, Dr. Radford stated that the studies of Japanese atomic bomb survivors "offer no evidence concerning the relationship of radiation exposure to development of polycythemia vera." In his supplemental report, Dr. Radford reiterated that "even the Japanese A-bomb survivor study offers no evidence about PV."[19]

Dr. Tai also cites Hoffman et al., *Hematology: Basic Principles and Practice* (Churchill Livingstone, New York, 1995), a hematology textbook, for the proposition that the Japanese atomic bomb data proves a causal link between radiation and PV. Dr. Hoffman's textbook does not provide further support for Dr. Tai's opinion, for it simply cites the Committee and Caldwell and adds no new analysis.

*Microdosimetry and the Non–Threshold Hypothesis*

As final support for his opinion that radiation can cause PV, Dr. Demopoulos relies on microdosimetry theory. This theory involves analyzing the damaging effects of alpha particles on DNA molecules. Dr. Demopoulos' discussion of microdosimetry focuses upon the induction of cancer by alpha particles. PV, however, is not cancer. To find microdosimetry relevant to Muzzey's alleged PV, therefore, he must assume that PV is caused by DNA damage. He cites no authority for this proposition, however. He states that it is "clear" that DNA damage has "unleashed controlled growth factors," but makes no connection between this "clear" principle and PV. He admits that the causes of PV have not been exactly identified.

### The Daubert Principles

Under the Federal Rules of Evidence, "[p]reliminary questions concerning ... the admissibility of evidence shall be determined by the court." FED.R.EVID. 104(a). *See also Bradley v. Brown,* 42 F.3d 434, 436 (7th Cir.1994) ("It is well established that issues related to expert opinion testimony are matters of law to be determined by

---

**18.** The defendants also note that the same source cited by Dr. Tai also studied the incidence of PV among those present when the bomb was dropped at Nagasaki. Of 40,000 exposed Nagasaki survivors, only one person was diagnosed with PV, and that patient had been exposed 2.3 kilometers from the hypocenter.

**19.** Dr. Demopoulos does not cite a Japanese A-bomb study as support for his opinion that radiation can cause PV either.

the trial judge."). The proponent of the proffered expert testimony bears the burden of establishing its admissibility by a preponderance of proof. *Bradley v. Brown,* 852 F.Supp. 690, 697 (N.D.Ind.), *aff'd.,* 42 F.3d 434 (7th Cir.1994); *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1316 (9th Cir.1995) (hereinafter *"Daubert II"*) ("The party presenting the expert must show that the expert's findings are based on sound science."). In determining whether the plaintiffs have met their burden in this case, the Court is guided by Federal Rule of Evidence 702 and its construction by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

Rule 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

In construing this rule, the Court explained that "the adjective 'scientific' implies a grounding in the methods and procedures of science" and "the word 'knowledge' connotes more than subjective belief or unsupported speculation." *Daubert,* 509 U.S. at 590, 113 S.Ct. at 2795 (citation omitted). Accordingly, a trial judge faced with a proffer of expert scientific testimony

must determine at the outset ... whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

*Id.* at ——, 113 S.Ct. at 2796. The Seventh Circuit has interpreted *Daubert* to require a two-step inquiry:

*Daubert* first "directs the district court to determine whether the expert's testimony pertains to scientific knowledge. This task requires that the district court consider whether the testimony has been subjected

to the scientific method; it must rule out 'subjective belief or unsupported speculation.'" Second, the district court must "determine whether the evidence or testimony assists the trier of fact in understanding the evidence or in determining a fact in issue. That is, the suggested scientific testimony must 'fit' the issue to which the expert is testifying."

*O'Conner v. Commonwealth Edison Co.,* 13 F.3d 1090, 1106 (7th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 2711, 129 L.Ed.2d 838 (1994) (citing *Porter v. Whitehall Laboratories, Inc.,* 9 F.3d 607, 613, 616 (7th Cir.1993)).

■ *Daubert* and its progeny set forth a nonexhaustive list of criteria to assist courts in determining whether a theory or technique constitutes "scientific knowledge" within the meaning of Rule 702. Courts should consider whether the proffered theory (1) can be and has been empirically tested, (2) has been subjected to peer review and publication, and (3) follows from a technique which has been generally accepted in the relevant scientific community. *Daubert,* 509 U.S. at 592–93, 113 S.Ct. at 2796–97; *Porter,* 9 F.3d at 613. The court should also consider "whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." *Daubert II,* 43 F.3d at 1317. *See also In re Paoli Railroad Yard PCB Litigation,* 35 F.3d 717, 742 (3rd Cir. 1994). Finally, the court may also consider whether the expert formed his opinion and then looked for reasons to support it, rather than doing research that led him to his conclusion. *See Claar v. Burlington Northern RR Co.,* 29 F.3d 499, 502–03 (9th Cir.1994) ("Coming to a firm conclusion first and then doing research to support it is the antithesis of [the scientific] method.").

■ An expert opinion that is not supported by a scientifically reliable methodology is not admissible under Fed.R.Evid. 702. *Daubert,* 509 U.S. at 590, 113 S.Ct. at 2795. Courts must take their role as "gatekeeper" seriously and exclude "subjective belief or unsupported speculation." *Porter,* 9 F.3d at

614 (citing *Daubert*, 509 U.S. at 590, 113 S.Ct. at 2795).

■ Applying *Daubert* and its progeny, I conclude that Drs. Tai, Radford, and Demopoulos may not testify regarding April Muzzey, for their opinion that radiation can cause PV "is not based on scientific knowledge, but is grounded on speculation shaped by result-oriented biases." *Whiting v. Boston Edison Co.*, 891 F.Supp. 12, 25 (D.Mass.1995).

Looking at *Daubert*'s first factor of reliability, it is clear that the proposition that radiation can cause PV has not been empirically proven. Although epidemological studies are not necessary to establish causation, the lack of any conclusive studies on the subject weighs against its admissibility. The fact that large-scale studies, such as those tracking Japanese survivors of the atomic bomb, do not establish a causal link between radiation and PV implies that this theory cannot be tested. Thus it fails the first reliability factor of *Daubert*. Although Dr. Tai reads this study to show a causal link between radiation and PV, the authors of the compilation themselves discredited the study on which Dr. Tai purported to rely. *See O'Connor*, 13 F.3d at 1107 (upholding exclusion of expert's testimony where "his conclusion regarding causation [was] not supported by the authors on which he claim[ed] to rely").

The Weinberg and Caldwell studies do not constitute empirical proof that radiation can cause PV either. Anecdotal reports such as Weinberg's and Caldwell's are not reliable bases to form a scientific opinion about a causal link. "Such anecdotal evidence, based on a few cases without systematic comparison or data collection, may be an incentive for more careful investigation but may also reflect rumor and speculation rather than fact." Federal Judicial Center, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 344 n. 25 (1994). This conclusion is especially true in this case, where Weinberg and Caldwell themselves do not argue that there is a causal link between PV and radiation. *See O'Connor*, 13 F.3d at 1107.

I also find significant the fact that none of these witnesses has done any research on this theory outside the context of this law-

suit. "That an expert testifies based on research he has conducted independent of the litigation provides important, objective proof that the research comports with the dictates of good science." *Daubert II*, 43 F.3d at 1317. *See also Paoli*, 35 F.3d at 742 n. 8 (court should consider "the non-judicial uses to which the method has been put"). In fact, none of these doctors has conducted or published any research on PV or leukemia. Drs. Tai and Demopoulos have little expertise on the health effects of radiation. Even Dr. Radford, who has studied the effects of radiation extensively, has never written about a connection between radiation and PV. There is no doubt here that these experts "developed their opinions expressly for purposes of testifying." *Id.*

As for the analogy to CML, the experts offer little reason for why this analogy should hold. They do not even agree about whether all myeloproliferative disorders share a similar etiology. They point to no scientific literature addressing or testing this analogy, nor to any scientist (except each other) who believes that because radiation may cause one myeloproliferative disorder it may cause all of them.

The experts have also relied on untrustworthy data in reaching their conclusions, namely the Savannah River reports. The newspaper accounts of the Savannah River data, relied on by all three experts, are inaccurate, as recognized by both the subsequent retractions by the newspaper and the admissions of the experts themselves. The opinion of an expert who relies on inaccurate data does not have a sufficiently reliable basis to be admissible under *Daubert*. That Dr. Tai, for example, is willing to ignore the fact that the data he used was inaccurate shows that his opinion is not "ground[ed] in the methods and procedures of science." *Daubert*, 509 U.S. at 590, 113 S.Ct. at 2795.

The attempts by Drs. Radford and Demopoulos subsequently to deny reliance on this data do not shelter their opinions from this criticism. The fact that Drs. Radford and Demopoulos relied on this data in forming their opinions, but then did not change their opinions when they "withdrew" their reliance

on it, is evidence that they have formed their opinion that radiation can cause PV first, and then subsequently searched for support for it. By searching for support for his opinion after he has formed it, the expert shows that he has not used the scientific method to derive his opinion. *See Claar*, 29 F.3d at 502–03.

Finally, Dr. Demopoulos' microdosimetry theory is not grounded in scientific knowledge. His report explains:

> To arrive at Causation, in Muzzey's polycythemia vera, the other multiple sciences can be utilized. For example, it is known that in PV, growth of red blood cells, and other blood cells is out of control. It is well established that DNA, the control molecules of the cell, must be altered and irreparably damaged in order to unleash out of control cancerous conditions. Muzzey's bone marrow cells have such growth control aberrations. These aberrations do not occur spontaneously. Children have excellent DNA control. Aberrations in DNA growth controls must be caused by something. It is clear that an injurious agent of great severity reached her bone marrow cells, irreparably damaged the DNA inside those cells, and unleashed uncontrolled growth factors. Proof of this is that she has PV.

This analysis does not show that radiation from thorium tailings caused Muzzey's illness. His assertion that "an injurious agent of great severity reached her bone marrow cells" does not show that the "agent" was radiation. Moreover, because some PV sufferers have not been exposed to unusual radiation, their PV must be caused by some other "agent" besides radiation. Dr. Demopoulos states no scientific basis for concluding that in Muzzey's case the "agent" is

radiation. His opinion that radiation caused Muzzey's illness is not scientific knowledge. "[S]omething doesn't become 'scientific knowledge' just because it's uttered by a scientist." *Daubert II*, 43 F.3d at 1315–16.

Drs. Demopoulos, Radford, and Tai will not be allowed to testify as to their opinion that radiation causes PV.

### Does Muzzey Have PV?

Even assuming that the plaintiffs could adequately prove that radiation is capable of causing PV, they would still have to prove that radiation actually caused Muzzey's PV. *See, e.g., Cavallo v. Star Enterprise*, 892 F.Supp. 756, 771 (E.D.Va.1995). As a threshold question, the plaintiffs must establish that Muzzey has PV.

Plaintiff's witnesses would testify that in their respective expert opinions, Muzzey has PV. According to Muzzey's present treating hematologist, Dr. Kovach, Muzzey does not have PV because she does not fulfill several of the criteria established to distinguish PV from secondary erythrocytosis.[20] He therefore diagnoses Muzzey with secondary erythrocytosis. The doctors at the Mayo Clinic who examined Muzzey similarly determined that Muzzey does not have PV because she does not fit the established criteria for PV.[21] Muzzey has been treated with phlebotomies (blood-lettings), an acceptable treatment for both PV and secondary erythrocytosis.[22]

The factor that most calls the diagnosis of PV into question is Muzzey's elevated level of EPO, which is inconsistent with a diagnosis of PV.[23] Recent studies show that PV patients have normal or low EPO levels—they never exceed the normal range—whereas patients with secondary erythrocytosis generally have elevated EPO levels.[24] As admitted

---

**20.** He noted that she does not have an enlarged spleen, elevated leukocyte alkaline phosphatase (LAP) activity, elevated serum $B_{12}$ levels, an elevated white blood cell count, or an elevated platelet count.

**21.** These doctors diagnosed Muzzey as having primary erythrocytosis, another blood marrow disease.

**22.** *See* THE MERCK MANUAL, *supra*, 1192–93.

**23.** *See* JAMES H. JANDL, BLOOD: TEXTBOOK OF HEMATOLOGY 707 Table 22–4 (1987) (listing differences between PV and secondary erythrocytosis).

**24.** *See, e.g.,* Gunnar Birgegard & Leif Wide, *Serum Erythropoietin in the Diagnosis of Polycythaemia and after Phlebotomy Treatment*, 81 Brit.J.Haematoloty 603, 604–05 (1992); H. Phillip Koeffler & Eugene Goldwasser, *Erythropoietin Radioimmunoassay in Evaluating Patients with Polycythemia*, 94 Ann.Intern.Med. 44 (1981); Marie–Helene Schlageter et al., *Radioim-*

by the plaintiffs' experts, for the past few years Muzzey's EPO levels have been high.

*Dr. Demopoulos*

As an initial matter, I find that Dr. Demopoulos is not qualified to testify whether Muzzey has PV. He has not spoken with any of Muzzey's physicians or examined Muzzey's blood or bone marrow samples. He has no expert knowledge of hematology.[25] In his supplemental report, he admitted that he "rel[ied] on the treating doctor's diagnosis of polycythemia vera (PV) because [he] did not examine her blood or marrow studies." He may therefore not testify on whether Muzzey has PV.

*Dr. Radford*

Dr. Radford is similarly unqualified to testify that Muzzey has PV. He is not a hematologist and has not treated a patient for over forty years. When asked if he could explain the inconsistency between Muzzey's high EPO levels and a diagnosis of PV, he answered only that a patient's EPO levels may rise after phlebotomies. He did not know, however, what EPO levels normally are, or how much they may rise after phlebotomies.[26]

*Dr. Tai*

Dr. Tai is the only plaintiffs' witness to have expertise in hematology. His opinion that Muzzey has PV, however, is not supported by a scientifically reliable methodology.

Dr. Tai has diagnosed Muzzey with PV based upon a report that a sample of Muzzey's bone marrow tissue grew an erythroid colony *in vitro*.[27] Muzzey's medical records, however, do not contain the laboratory report for this test, nor any description of the procedure followed. The only evidence the plaintiffs present is a handwritten note discussing the results which appears in the records of Muzzey's then-treating physician. Dr. Tai claims that this reported result of this marrow test suffices to justify a diagnosis of PV.

In making his diagnosis, Dr. Tai not only did not see the lab results themselves, but he did not have another test performed with Muzzey's marrow. Furthermore, Dr. Tai admitted in his deposition that a positive erythroid colony did not necessarily mean PV. Although testifying that it was "suggestive" of PV rather than secondary erythrocytosis, Dr. Tai could not state that the positive result was inconsistent with a diagnosis of secondary erythrocytosis. I therefore find that he has not used a scientifically reliable method in rendering his diagnosis.

When faced with the fact that Muzzey does not appear to fit the established criteria of PV, Dr. Tai pointed to an article in which the authors stated that the criteria list has been criticized as underinclusive. Aside from this article, Dr. Tai presents no reasons for departing from the medical literature on what constitutes PV.[28]

*munoassay of Erythropoietin: Analytical Performance and Clinical Use in Hematology,* 36 Clin. Chem. 1731 (1990).

25. When asked the difference between primary and secondary erythrocytosis, he could not answer, but instead said that he would refer that question to a hematologist.

26. Another court has drawn a similar conclusion about Dr. Radford's competency as a medical expert. *See Abbott v. Mayfield,* No. C–010506, 1992 WL 229522 (Ohio Ct.App. Sept. 16, 1992), *juris. motion overruled,* 66 Ohio St.3d 1404, 605 N.E.2d 1262 (Ohio 1993) (holding that Dr. Radford was not qualified to give competent medical testimony because "he was not licensed to practice medicine and was long removed, in his chosen field of expertise as an epidemiologist, from the actual diagnosis and treatment of individual patients").

27. This test involves observing whether a sample of marrow tissue taken from the body will produce blood cells in the absence of EPO. *See* HARRISON'S PRINCIPLES OF INTERNAL MEDICINE, *supra,* 1760.

28. Dr. Tai has recently asserted that Muzzey has elevated white cell and platelet counts that satisfy the diagnostic criteria for PV. In his earlier testimony, however, Dr. Tai admitted that Muzzey's white cell count was normal. Moreover, the only evidence of elevated white counts is one result from October of 1993 and one from April of 1995. In between those readings, her white cell count was normal. Dr. Tai admits that to support a diagnosis of PV, Muzzey's white cell counts must have been *consistently* elevated.

Dr. Tai's basis for ignoring Muzzey's high EPO levels is similarly unscientific. His answer to this inconsistency was to suggest that her high EPO levels resulted from periodic phlebotomies used to manage her condition. In support of this contention, he cited several articles observing EPO increases after phlebotomies. One of the articles he cites, however, shows that PV patients' EPO levels sometimes decreased after phlebotomy, and never rose above the normal range. Nor do any of the other articles he cites observe post-phlebotomy increases as high as Muzzey's EPO levels. Therefore none of the articles cited by Dr. Tai provides a reliable basis for discounting Muzzey's high EPO levels.[29] In response to this problem, Dr. Tai then speculated that "one could make an argument" that Muzzey has "a variant of [PV]." His guess that Muzzey may have a variant of PV is a simple "subjective belief or unsupported speculation" and therefore inadmissible.[30]

Finally, Dr. Tai also uses an unscientific basis to determine that Muzzey did not have her illness before she moved to West Chicago.[31] Muzzey's medical records show that her hemoglobin levels were elevated, an indicator of both secondary erythrocytosis and PV, in 1984, two years before she moved to West Chicago. Dr. Tai's response to this evidence is to state that through conversations with the Muzzey family, he ascertained that Muzzey's mother visited friends in West Chicago while pregnant with her. Moreover, Dr. Tai stated that the plaintiffs' dose expert had calculated a prenatal dose of radiation for Muzzey. Dr. Tai's supplemental report states that Muzzey's "rising hemoglobin 2 years before she actually moved to the West Chicago area does not indicate that she therefore did not have radiation as a possible cause of her disease.... This can still be consistent with prenatal radiation exposure."

The plaintiff's dose expert, however, did not calculate any prenatal radiation exposure to Muzzey. I therefore find that Dr. Tai's conclusion that Muzzey could have contracted PV based on prenatal exposure to the West Chicago thorium is not grounded in science. The plaintiffs have not made any attempt to quantify the amount of exposure Muzzey may have received. An opinion based on prenatal exposure is pure speculation and therefore inadmissable.

In sum, Dr. Tai's analysis is not reliable to show that Muzzey has PV, rather than secondary erythrocytosis. His reliance on articles showing high EPO levels after phlebotomies do not support Muzzey's high EPOs. Additionally, his reliance on a secondhand lab report of Muzzey's treating physician, rather than an accurate lab report is not scientific. Lastly, his guess that Muzzey was exposed prenatally is pure speculation.

### Conclusion

Muzzey has failed to demonstrate that the opinions of Drs. Demopoulos, Radford, and Tai on whether radiation can cause PV and whether Muzzey has PV are grounded in the scientific method.[32] Consequently, their testimony regarding April Muzzey is not admissible under Rule 702 and *Daubert.*

---

**29.** Dr. Tai admits that there is no study showing a patient conclusively diagnosed with PV whose EPO levels after phlebotomy, using the modern measurement technique, rose to Muzzey's high levels.

**30.** Even if Dr. Tai could testify that Muzzey has "a variant of PV," his testimony would not help the plaintiffs unless they could show that radiation could also cause this variant of PV.

**31.** If Muzzey contracted her disease before being exposed to the thorium tailings, the tailings obviously could not have caused her disease.

**32.** Because I conclude that the experts may not testify that radiation can cause PV or that Muzzey has PV, I do not address whether they could testify that the defendants' thorium caused Muzzey's illness.