**ESTATE OF Jeffrey A. MITCHELL; Verna Mitchell, individually and as Executor; Bryan A. Mitchell, a minor; Shaun R. Mitchell, a minor, by and through their mother and next friend, Verna Mitchell, Plaintiffs,**

v.

**GENCORP, INC., et al., Defendants.**

**No. 94–4110–RDR.**

United States District Court,
D. Kansas.

June 19, 1997.

David O. Alegria, McCullough, Wareheim & LaBunker, P.A., Topeka, KS, for Plaintiffs.

William E. Enright, Scott, Quinlan & Hecht, Topeka, KS, Robert P. Numrich, Evans & Dixon, Kansas City, MO, Martha M. Weast, Evans & Dixon, Leawood, KS, William Gorenc, Fairlawn, OH, for Defendants.

### MEMORANDUM AND ORDER

ROGERS, District Judge.

Plaintiffs allege that Jeffrey Mitchell was exposed to various chemicals manufactured by defendant Gencorp, Inc. while he was employed with Midway Sales and Distribution, Inc. They further allege that as a result of this exposure Mitchell contracted chronic myelogenous leukemia (CML) and died on June 1, 1995. The defendant has filed a motion in limine and a motion for summary judgment. In the motion in limine, defendant contends that the testimony of plaintiffs' expert witnesses is not admissible because this evidence does not meet the necessary foundation requirements set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In the motion for summary judgment, defendant argues that, in light of the deficiency of the plaintiffs' expert testimony as established in the motion in limine, plaintiffs have not sufficiently demonstrated that defendants caused Mitchell's disease and death.

In light of the arguments raised by the defendant, the court scheduled a hearing to consider the expert testimony to be offered by plaintiffs under *Daubert.* The court heard from all of the expert witnesses that the parties intend to call in this case on the issue of causation. Having carefully reviewed that evidence, the court is now prepared to rule on the pending motions.

### I.

The background to the issues presented can be summarized as follows. Jeffrey Mitchell was employed by Midway Sales and Distribution, Inc. on or about February 1, 1988. He continued to work there through 1993 as a driver/warehouseman. Midway Sales sold products for use in construction including adhesives, primers and caulking. These products were manufactured and distributed by the defendant. Most of the products sold by Midway Sales were stored in a room called the "Flammable Room." The Flammable Room is twelve feet wide and thirty-five feet long with a ceiling height of ten feet. The products manufactured by the defendant that were stored in the Flammable Room contained a variety of chemicals including the following: toluene, toluol, xylene, hexane, heptane, di-sec-octyl phthalate and methylene disphenyl isocyanate (MDI). During his employment, Mitchell was in the Flammable Room for varying periods each day. There is some evidence that there was leakage from some of the containers of chemicals. The evidence also suggests there was no forced ventilation in the Flammable Room. Mitchell was diagnosed with CML on June 25, 1992. He died as a result of the disease on June 1, 1995.

This action was filed on June 21, 1994. Plaintiffs assert claims of negligence, breach of express and implied warranties, and strict liability. Plaintiffs seek both compensatory and punitive damages.

### II.

In *Daubert,* the United States Supreme Court set forth the standard for admissibility of scientific expert testimony. The Court ruled that the "general acceptance" standard

for scientific expert evidence, originally set forth in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923), had not survived the adoption of the Federal Rules of Evidence. The Court held that trial judges must use a more "flexible" test, consistent with the "liberal thrust" of those Rules. *Daubert,* 509 U.S. at 588, 594, 113 S.Ct. at 2794.

Construing Fed.R.Evid. 104(a) with Fed. R.Evid. 702, the Court assigned trial judges the gatekeeping task of determining "at the outset, whether the expert was proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony *is* scientifically valid." *Id.* at 592–93, 113 S.Ct. at 2796.

First, the trial court must determine whether the experts' testimony reflects "scientific knowledge." 509 U.S. at 589–90, 113 S.Ct. at 2795. The trial court must determine whether the opinion has "a reliable basis in the knowledge and experience of . . . [the expert's] discipline." *Id.* at 592, 113 S.Ct. at 2796. Although the Court declined to provide a definitive test for the trial judge to use in making this determination, it did provide a non-exclusive list of four factors (none of which is alone determinative) that would be useful in determining the soundness of the methodology from which the proffered conclusions are derived: (1) whether the theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error or the existence of standards; and (4) whether the theory or technique used has been generally accepted. *Id.* at 593–94, 113 S.Ct. at 2796–97.

The *Daubert* Court did not explicitly rank or weight these factors, but it did indicate that the first factor—whether the theory or technique has been tested—is a "key question." *Id.* at 593, 113 S.Ct. at 2796–97. The second factor—peer review and publication— is described by the Court as a means of determining whether the theory or technique has been submitted to "scrutiny of the scientific community." *Id.* The Court noted that

such scrutiny "increases the likelihood that substantive flaws in methodology will be detected." *Id.* The third factor—the rate of error and the existence and maintenance of standards—is closely related to the issue of testing. *Id.* at 594, 113 S.Ct. at 2797. Finally, the Court noted that, in determining reliability, the trial judge is permitted, but not required, to consider the degree to which the theory or technique is generally accepted in the relevant scientific community. *Id.* "Widespread acceptance can be an important factor in ruling particular evidence admissible. . . ." *Id.*

The Ninth Circuit, on remand of the *Daubert* case, had this to say about the formidable task faced by trial courts in applying the first prong of the Supreme Court's analysis:

> As we read the Supreme Court's teaching in *Daubert,* therefore, though we are largely untrained in science and certainly no match for any of the witnesses whose testimony we are reviewing, it is our responsibility to determine whether those experts' proposed testimony amounts to "scientific knowledge," constitutes "good science," and was derived by the "scientific method."

> The task before us is more daunting still when the dispute concerns matters at the very cutting edge of scientific research, where fact meets theory and certainty dissolves into probability. As the record in this case illustrates, scientists often have vigorous and sincere disagreements as to what research methodology is proper, what should be accepted as sufficient proof for the existence of a "fact," and whether information derived by a particular method can tell us anything useful about the subject matter.

> Our responsibility, then, unless we badly misread the Supreme Court's opinion, is to resolve disputes among respected, well-credentialed scientists about matters squarely within their expertise, in areas where there is no scientific consensus as to what is and what is not "good science," and occasionally to reject such expert testimony because it was "derived by the scientific method." Mindful of our position in the hierarchy of the federal judiciary, we take

a deep breath and proceed with a heady task.

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1316 (9th Cir.1995).

Second, the court must ensure that the proposed expert testimony is "relevant to the task at hand." *Daubert,* 509 U.S. at 597, 113 S.Ct. at 2799. This prong is related to the concept of "relevancy" set forth in Fed. R.Evid. 401 and 402. This part of the analysis, referred to by the Supreme Court as the "fit requirement," examines whether the expert testimony logically advances a material aspect of the proposing party's case. *Id.* at 591–92, 113 S.Ct. at 2795–96. As the *Daubert* court noted, "fit" is required because "scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Id.* at 591, 113 S.Ct. at 2796. The proponent of the expert testimony has the burden of showing by a preponderance of the evidence that both prongs of the test established in *Daubert* are satisfied. *Id.* at 592 n. 10, 113 S.Ct. at 2796 n. 10.

▆ As explained in *Cavallo v. Star Enterprise,* 892 F.Supp. 756, 761–62 (E.D.Va. 1995), aff'd, 100 F.3d 1150 (4th Cir.1996), the two requirements may have considerable overlap in a given case:

> The distinction between "scientific validity" and "fit" is not always clear, and the two inquiries may overlap in a particular case. For instance, there may be times where an expert relies on published literature and widely accepted, tested theories in forming her opinion, and her ultimate conclusion is clearly relevant to an issue in the case. Yet, if those published theories and studies purport to prove XYZ, and from them, the expert concludes ABC, it may be that the expert's reasoning process itself is not scientifically valid. Put another way, there may be a lack of "fit" between the tested theories relied upon and the ultimate conclusion reached. An extreme example illustrates this point. A study regarding the mating habits of gypsy moths may be scientifically valid for certain purposes, and an expert's conclusion that a particular chemical caused a certain illness may be relevant in a given case. But if the expert purports to base

her causation conclusion on the gypsy moth study, then the opinion can hardly be said to have met the requirements of Rule 702. Although courts must not exclude expert testimony based on a valid methodology simply because they disagree with the ultimate conclusion reached, they have an obligation to ensure that the conclusion is reliable, that is, that there is a scientifically valid link between the sources or studies consulted and the conclusion reached. *Cf. Porter v. Whitehall Lab., Inc.,* 9 F.3d 607, 614 (7th Cir.1993) (stating that "[i]f experts cannot tie their assessment of data to known scientific conclusions, based on research or studies, then there is no comparison for the jury to evaluate and the expert's testimony is not helpful to the jury").

### III.

Plaintiffs produced five experts who have opinions concerning Jeffrey Mitchell's exposure to certain chemicals and whether such exposure caused his CML. These experts were: Steve Herron, an industrial hygienist; Larry Steven Milner, M.D., hematologist and oncologist; Peter Van Veldhuizen, M.D., Mitchell's primary physician; Barry Skikne, M.D., another of Mitchell's physicians; David E. Einsphar, M.D., another of Mitchell's physicians involved in the bone marrow transplant. The defendant presented two witnesses: Ralph Keller, Jr., an industrial hygienist; and J. Wesley Clayton, a toxicologist.

### PLAINTIFFS' WITNESSES

*Steve Herron*

Herron is a certified industrial hygienist. The role of an industrial hygienist is to recognize and attempt to control occupational health hazards. Herron examined the Material Safety Data Sheets for the products that were stored in the Flammable Room. He identified three chemicals that could cause cancer: di-sec-octyl phthalate, toluol and MDI. He stated that di-sec-octyl phthalate is classified as a Class I carcinogenic chemical. He indicated that a Class I carcinogenic chemical is one that has produced cancer in animals and thus could be harmful to hu-

mans, but that there is inadequate evidence to make it a human carcinogen. He testified that toluol and MDI were Class III questionable carcinogens, which he has described as substances that are close to known carcinogens but there is inadequate data to make a positive determination. During his testimony, Herron added a fourth chemical to his list of carcinogens. Based upon some information provided by plaintiffs' counsel, Herron noted that toluene had been determined to be a known carcinogen in California. Herron, however, was unaware of any studies that showed that any of these chemicals caused CML.

### Peter Van Veldhuizen

Van Veldhuizen is a physician who specializes in hematology and oncology. He received his medical degree in 1986. He is presently a staff physician with the Veterans Administration Hospital in Topeka, Kansas. Dr. Van Veldhuizen first saw Mitchell in August 1992. Mitchell was referred to Dr. Van Veldhuizen by Dr. David Einsphar. Dr. Van Veldhuizen examined Mitchell for the purpose of conducting a bone marrow transplant. At his deposition, Dr. Van Veldhuizen had opined that there is a "strong possibility that exposure to toxic chemicals may have lead to the development of [Mitchell's] leukemia." At that time, he had found no studies indicating that any of the chemicals that Mitchell had possibly been exposed to caused CML. Prior to the *Daubert* hearing, Dr. Van Veldhuizen conducted a research effort to determine if there was any literature linking the chemicals in the Flammable Room to CML. He produced three articles which he contended supported his view that Mitchell's CML was caused by exposure to chemicals. He suggested that the first article, Vigliani, *Leukemia Associated with Benzene Exposure*, Ann.N.Y.Acad.Sci., 271:143–151(1976), showed a "possible association" of benzene and CML. He noted that the article referenced a study where 13 of 44 individuals who had contracted leukemia in Paris from 1950 to 1965 as a result of chronic benzene exposure had been diagnosed as suffering from CML. Dr. Van Veldhuizen stated that these figures had come from another article and he did not have access to it. In the article, Vigliani recognizes that benzene has been

regarded for almost a century as "a powerful bone-marrow poison." Vigliani noted that his study and others had shown that heavy exposure to benzene causes acute leukemia. The question, however, of whether such exposure causes chronic leukemias was not clear. He stated:

> If there seems to be little doubt about acute or subacute leukemia being induced by benzene, the occurrence of chronic benzene leukemias is not so convincingly demonstrated in all cases. Many were isolated cases, and a consistent exposure to benzene is not always well documented. However, several cases of chronic leukemia seem to have been heavily exposed to benzene, and there is no prior reason for not accepting them as benzene-induced leukemias simply on the grounds that we have never seen such cases. Unfortunately, almost no statistical data demonstrating a higher incidence of chronic leukemia among workers exposed to benzene are available at present. In this respect, a recent study by Girard and Revol is worth mentioning. They made a retrospective statistical study of severe hemopathies seen in Lyon hospitals and found a history of exposure to benzene and/or its homologues in the preceding ten years in a significantly higher proportion of patients with acute leukemia, chronic lymphocytic leukemia, and aplastic anemia, but not with chronic myeloid leukemia and other blood disorders, than among control patients with diseases not related to the hemopoietic system.

*Id.* at 148(footnote omitted)

With regard to toluene, Vigliani stated:

> [S]ince the replacement of benzene with toluene as a solvent in the rotogravure industry in 1964, we have seen no new cases of aplastic anemia nor of leukemia due to toluene exposure. Furthermore, toluene-exposed workers do not show the chromosome aberrations frequently seen in workers exposed to benzene.

*Id.*

Vigliani concluded as follows:

> From the vast literature accumulating over the past forty years, the conclusion

can be drawn that clinical as well as epidemiological data are indicative of a strong leukemogenic action of benzene in man, the leukemia being mostly acute and myeloblastic in type, occurring directly or following aplastic changes in the bone marrow, and that the probability exists that benzene might also induce chronic types of leukemia.

The next article produced by Dr. Van Veldhuizen was Austin, Delzell and Cole, *Benzene and Leukemia,* Am.J.Hygiene, 127:419–439 (1988). Dr. Van Veldhuizen suggested that this article showed "mostly strongly the association" of benzene with acute myelogenous leukemia. This article reviewed the evidence, which consisted primarily of epidemiological studies, of the relationship between benzene and leukemia. The authors concluded after a lengthy review of a number of studies that "[t]he epidemiologic literature on benzene and leukemia supports the inference that benzene causes acute myelocytic leukemia." They noted, however, that the data was too sparse or suffered from other problems to substantiate a conclusion that exposure to low levels of benzene causes leukemia. This article does reference one study which suggested "a strong positive relation between most forms of leukemia and benzene or toluene." The authors noted, however, that study did not "distinguish between benzene and toluene, and it provides no estimate of dose-response."

The final article produced, Infante and Rinsky, *Leukemia in Benzene Workers,* The Lancet 76–78 (1977), concerns a study of rubber workers who were exposed to benzene. This particular study, known as the Pliofilm cohort, has been the subject of much discussion and research. The rubber workers had been exposed to benzene during the period from 1940 to 1949 and the group had thereafter been followed to 1977. The authors of the article found that a number of these workers developed acute leukemia. They, however, discovered only two cases of CML. The authors suggested that the dramatic relationship between benzene and leukemia should mandate efforts to control occupational and consumer exposure to benzene.

Dr. Van Veldhuizen was forced to acknowledge that he had no information that Mitchell had ever been exposed to benzene. He was further aware that Mitchell suffered from CML, not acute myelogenous leukemia. Finally, he admitted that he had found no articles to support his conclusion that the chemicals that Mitchell was exposed to could cause bone marrow damage.

He continued to hold to his opinion that the chemicals Mitchell was exposed to could cause CML. His opinion is based upon the following assumptions: (1) the chemicals to which Mitchell was exposed are similar in chemical structure to benzene and therefore the reaction to them should be the same; and (2) a chemical that can cause acute myelogenous leukemia should also cause CML.

*Larry S. Milner*

Milner is a physician certified in hematology and oncology. He graduated from medical school in 1966. He has been in private practice since 1972. He is also an attorney. He has provided medical testimony in 240 to 300 cases, most of those on the side of the plaintiff. Dr. Milner received a variety of information from plaintiffs' counsel concerning Mitchell and his CML. Upon review of the Material Safety Data Sheets provided by plaintiffs' counsel, he found six chemicals that could have caused Mitchell's CML. Dr. Milner conducted some review of the literature on the association of chemicals and CML. He ultimately concluded that Mitchell's exposure to chemicals was a factor in his development of CML. In reaching this conclusion, he initially noted that it was unquestioned that benzene had been accepted as a chemical cause of CML. He further noted that chemicals such as toluene, xylene, tetrahydrofuran, acetone, hexane and heptane were all chemically similar to benzene. He thus summarized his analysis as follows:

> Once we know a particular chemical causes something, we don't as researchers or physicians then pretend that each other related chemical has to be reproven in the same way. We accept that related chemicals will follow the same principles.... So it appeared to me that the chemicals that I listed that he was exposed to, given the exposure they had, would suffice to

fulfil. the required requisite of being related enough to benzene to be accepted as a possible factor in the development of his [CML].

Dr. Milner, however, acknowledged that none of the literature he had examined showed a relationship between toluene or xylene and CML. He did note the one reference contained in the article, Benzene and Leukemia, to toluene. He further admitted that none of the articles he produced suggest that similar chemicals should be treated the same as benzene.

*Barry Skikne*

Skikne is a physician who specializes in hematology. He has been licensed to practice medicine in the State of Kansas for twenty years and has been associated with the University of Kansas Medical Center during that period. He has been a full professor there since 1991. Dr. Skikne saw Mitchell in the summer of 1993 for a possible bone marrow transplant. He ultimately concluded that Mitchell's exposure to chemicals in the Flammable Room caused his CML. He prepared a document entitled *Association Between Chemical Exposure and Development of Chronic Myeloid/Granulocytic Leukemia (CML)* which set forth his conclusions concerning the cause of Mitchell's CML. In this document, he reviewed various studies that showed a relationship between benzene and leukemia and reached the following conclusions:

> Based on this information and the knowledge that chemical spills of products containing the above-mentioned chemicals [xylene, toluene, hexane, polysocyanate, heptane, toluol, textile spirits and acetone] occurred without adequate cleanup, it is highly possible that the development of CML in the patient concerned may be related to occupational exposure. In my own experience *as* a Hematologist, I have seen CML occur in other patients exposed to similar chemicals.

Dr. Skikne testified that he believed that toluene, toluol and xylene were chemicals that could damage bone marrow. He reached this conclusion based upon a review of the literature on the issue and his personal knowledge. Dr. Skikne acknowledged, however, that he had found no articles that indicated that xylene, toluol or toluene caused leukemia. He did point to an article, *Increased Risk of Acute Myelogenous Leukemia (AML) and Chronic Myelogenous Leukemia (CML) in a County of Hesse, Germany, Soz Praventivmed,* 38: 190–195 (1993), where the authors considered trinitrotoluene (TNT) use in Germany. In this article, the authors examined the incidence of leukemia in an area in Germany where TNT had been used to produce explosives during World War II. They found a high incidence of AML and CML in this area, particularly in Germans over the age of 64. The authors reached the following conclusion:

> The incidence of acute and chronic myelogenous leukemias has been compared for the two neighboring regions of Marburg and Giessen in Hesse (Germany). The investigation was based on the incident cases of the years 1983–1989 which have been diagnosed in the hematological departments of the universities of the two regions. The epidemiological evaluation of the data has been carried out in terms of a historical follow-up study, and shows an increased relative risk for the region around Marburg with a particular elevation for one community within this region. Potential determinants are discussed and focus on trinitrotoluene (TNT) and decomposition products which are known to contaminate the soil of this community, in some places severely, due to insufficient removal of remnants of the TNT production in large underground plants during World War II.

Dr. Skikne admitted, however, that TNT is a different chemical than toluene. He suggested that additional work would need to be done to determine if chemicals with similar structures metabolize in the body in the same way. He could not offer an opinion on that issue, admitting that he was not qualified to give such an opinion.

*David Einsphar*

Einsphar is a physician who specializes in hematology and oncology. He is board certified in both fields. He graduated from medical school in 1980. Dr. Einsphar first saw

Mitchell in June 1992. He subsequently diagnosed Mitchell as suffering from CML and prescribed some medication. Dr. Einsphar was unwilling to offer an opinion on the cause of Mitchell's CML. He had reviewed some research that indicated that exposure to benzene was associated with AML and perhaps with CML. He further suggested that toluene had been associated with leukemia, but he acknowledged that he was unaware of any study that had demonstrated this association. He also acknowledged that he had not seen any studies that indicated that toluene or xylene metabolize the body in the same way as benzene.

**DEFENDANT'S WITNESSES**

*Ralph Keller, Jr.*

Keller is a certified industrial hygienist. He examined the Flammable Room at Midway Sales, looked at the Material Safety Data Sheets, and considered the testimony of Mitchell and the owner of Midway Sales, Ken Daniels. In examining the Material Safety Data Sheets, he noted that none of the chemicals contained on those sheets had been associated with leukemia. He further noted that many of the chemicals in the room were self-sealing, i.e., they would seal themselves if a leak occurred. He suggested the only accurate method of determining what an employee has been exposed to is take air samples. He stated that without air monitoring, there is no way to determine the level or amount of exposure to any substance by an employee. He noted that no air monitoring had been done at Midway Sales.

*Jay Wesley Clayton*

Clayton is a professor of pharmacology and toxicology. He testified that in order to properly determine if a chemical caused a disease, it is important to know the dose, its concentration, and the duration of the exposure. He examined the Material Safety Data Sheets of the chemicals found in the Flammable Room. He indicated that none of the chemicals contained in the products in the Flammable Room had been identified as human carcinogens or leukinogens. He said that only benzene had been associated with leukemia, and that research has failed to show that even benzene caused CML. Clayton pointed specifically to a recent article,

Wong, *Risk of Acute Myeloid Leukaemia and Multiple Myeloma in Workers Exposed to Benzene*, Occupational and Environmental Medicine, 32: 380–84 (1995), as support for his conclusions. In this article, Dr. Otto Wong examined a number of studies, including the aforementioned Pliofilm study, that had considered the relation between exposure to benzene and the onset of leukemia. He reached the following conclusions:

> For cell types other than AML, the Pliofilm study does not provide sufficient cases for any meaningful analysis. The specific cell type with the second largest number of cases in the Pliofilm study was chronic myeloid leukaemia (CML), consisting of only two deaths. One of the two deaths from CML was employed at one of the plants for one month in 1948, and died two years later in 1950 at age 29. His cumulative exposure was 0–10 ppm-year. Clearly this case could not have been associated with exposure at the plant. Thus, the Pliofilm study offers little useful information on CML or other leukaemia cell types besides AML.
>
> Several epidemiological studies have reported the lack of an association between exposure to benzene or mixtures containing benzene and other leukemia cell types. For example, no association between CML and exposure to benzene or other organic solvents was found in case-control studies conducted in Sweden and in England. Similarly, case-control studies of CLL conducted in the Baltimore area and in four states in the United States (Washington, Utah, Michigan and Georgia) did not detect any increased risk in people exposed to benzene.

*Id.* at 382 (footnotes omitted).

Finally, Clayton suggested that toluene and xylene do not react in the body in the same way as benzene. He noted that benzene metabolizes in the body in a much different fashion than these other chemicals.

**IV.**

The court must now determine whether the testimony of the plaintiffs' expert witnesses is admissible. The court notes at

least two of the factors identified in *Daubert*—testing and rate of error—have no application here since the plaintiffs' experts did not perform any original research. *Lust v. Merrell Dow Pharmaceuticals, Inc.,* 89 F.3d 594, 597 (9th Cir.1996). Rather, plaintiffs' experts surveyed available literature and drew certain conclusions from those presented by the scientists who performed the original work.

█ With that said, we turn to consideration of whether the research conducted by plaintiffs' experts satisfies the applicable guarantees of reliability. We initially find it significant that all of plaintiffs' experts developed their opinions expressly for the purpose of testifying. None of the witnesses has done any research on his theories outside the context of this lawsuit. "That the expert failed to subject his method to peer-review and to develop his opinion outside the litigation is not dispositive, but if these guarantees of reliability are not satisfied, the expert 'must explain precisely how [he] went about reaching [his] conclusions and point to some objective source ... to show that [he has] followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in [his] field.'" *Lust,* 89 F.3d at 597 (quoting *Daubert,* 43 F.3d at 1318–19).

Next, we are concerned by the fact that Drs. Van Veldhuizen and Milner formed their opinions before reading the relevant literature. This is not proper scientific method. "Coming to a firm conclusion first and then doing research to support it is the antithesis of this method.... [S]cientists whose conviction about the ultimate conclusion of their research is so firm that they are willing to aver under oath that it is correct prior to performing the necessary validating tests could properly be viewed by the district court as lacking the objectivity that is the hallmark of the scientific method." *Claar v. Burlington Northern Railway Co.,* 29 F.3d 499, 502–03 (9th Cir.1994). The experts here followed the same path as the experts in *Sorensen By and Through Dunbar v. Shaklee Corp.,* 31 F.3d 638, 649 (8th Cir.1994) where the court excluded the testimony of the experts and stated: "Instead of reasoning from known facts to reach a conclusion, the experts here reasoned from an end result in order to hypothesize what needed to be known but what was not."

█ Finally, we turn to actual opinions offered by the plaintiffs' expert witnesses. The court does not find that plaintiffs' expert witnesses sufficiently adhered to established methodology in forming their opinions that Mitchell's exposure to various chemicals in the Flammable Room caused him to contract CML. Their testimony is not supported by "appropriate validation" as required by *Daubert* and is ultimately unreliable. The opinions of these experts are based largely on hypothesis and speculation. They made no efforts to test their theories and, of course, their theories have not been subjected to peer review or publication. In addition, the published scientific literature and test results do not support their conclusions. In *Daubert,* the Supreme Court said that the word "knowledge" in Rule 702 "connotes more than subjective belief or unsupported speculation. The term 'applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds.'" 509 U.S. at 590, 113 S.Ct. at 2795 (quoting Webster's Third New International Dictionary 1252 (1986)). "Proposed testimony must be supported by appropriate validation—i.e., 'good grounds,' based on what is known." *Id.*

Plaintiffs' experts did produce research that has found that exposure to benzene causes acute myelogenous leukemia (AML). They made efforts to jump from this finding to an opinion that (1) exposure to benzene also causes CML; and (2) exposure to other chemicals similar in structure to benzene can cause CML. The problem with these opinions is that there is no scientific research or data to support them. Plaintiffs' experts were unable to provide any research study that concluded that exposure to benzene causes CML. Several studies mentioned the possibility, but each one concluded that there was inadequate data to reach such a conclusion. Dr. Van Veldhuizen suggested that if exposure to benzene causes AML, then there is no reason why exposure to benzene should not cause CML. Such a conclusion, without scientific support, is just the type of specula-

tion that the Supreme Court sought to exclude in *Daubert.*

Even if there was some scientific support for the opinion that benzene causes CML, there is no evidence before the court that Mitchell was ever exposed to benzene. The Material Safety Data Sheets of the products in the Flammable Room do not show the presence of benzene in any of the products. Herron tried to overcome this problem by suggesting that benzene remained in some of the products when the other chemicals were produced. Once again, there was nothing to support this contention. He suggested that this opinion was based on "general knowledge." Given the lack of support for this opinion, the court finds it to be rank speculation and, thus, inadmissible.

█ In an effort to circumvent the lack of research in support of their positions, plaintiffs' experts have pointed to several matters as support for their opinions. First, several of the doctors pointed to a single sentence contained in a research article, *Benzene and Leukemia.* This article referenced another study that suggested a relationship between leukemia and benzene and toluene. None of the doctors examined or produced the underlying study. In light of these circumstances, the court is unwilling to attach any credence to this study. The court does not believe that any scientist would attach weight to a study that he did not carefully examine and consider. Moreover, the study relied upon by plaintiffs' experts was criticized in the very article that mentioned it because it failed to distinguish between benzene and toluene, and it failed to provide any estimate of dose-response. Second, Herron, the industrial hygienist, pointed to the fact that one of warning labels from one of the products manufactured by the defendant indicated that toluene had been deemed a carcinogen by the State of California. Again, the court does not find this fact adequate from a scientific standpoint to support the ultimate conclusion reached by plaintiffs' experts. Neither Herron nor any of the doctors ever determined how this decision was made by California authorities. In addition, as noted previously, plaintiffs' experts failed to produce any scientific evidence that toluene causes leukemia, and more specifically, CML. Third, several of the doctors suggested that the chemicals that Mitchell was exposed to would cause the same problems as benzene because these chemicals and benzene have similar chemical structures. There are, of course, several problems with this suggestion. Again, as previously noted, the studies and data fail to adequately support a conclusion that even benzene causes CML. Next, and more importantly, plaintiffs' experts failed to provide any support for this conclusion. They failed to point to any objective source demonstrating that their conclusions were generally accepted by or espoused by other scientists. "When a scientist claims to rely on a method practiced by most scientists, yet presents conclusions that are shared by no other scientist, the district court should be wary that the method has not been faithfully applied." *Lust,* 89 F.3d at 598. In sum, the court finds as a matter of law that the opinions of the plaintiffs' expert witnesses are not based on scientifically valid principles and, therefore, do not meet the reliability requirements of Rule 702 as interpreted by the Supreme Court in *Daubert.*

After a review of a number of cases applying *Daubert,* the court is convinced that we have correctly concluded that the testimony of plaintiffs' expert witnesses must be excluded. *See Allen v. Pennsylvania Engineering Corp.,* 102 F.3d 194 (5th Cir.1996) (opinion of plaintiff's expert that decedent's brain cancer caused by exposure to ethylene dioxide properly excluded); *Cavallo v. Star Enterprise,* 100 F.3d 1150 (4th Cir.1996) (opinion of plaintiff's expert that plaintiff's respiratory illness caused by exposure to jet fuel vapors properly excluded); *Wright v. Willamette Industries, Inc.,* 91 F.3d 1105 (8th Cir.1996) (opinion of plaintiff's expert that plaintiff's personal injuries caused by exposure to formaldehyde from nearby fiberboard plant properly excluded); *Rosen v. Ciba–Geigy Corp.,* 78 F.3d 316 (7th Cir.1996) (opinion of plaintiff's expert cardiologist that plaintiff's heart attack caused by use of nicotine patch properly excluded); *Wheat v. Pfizer, Inc.,* 31 F.3d 340 (5th Cir.1994) (opinion of plaintiff's expert that decedent's hepatitis caused by use of two medications properly excluded); *O'Conner v. Commonwealth Edi-*

son Co., 13 F.3d 1090 (7th Cir.1994) (opinion of plaintiff's expert opthamologist that plaintiff's cataracts were caused by exposure to nuclear radiation properly excluded); *Porter v. Whitehall Laboratories, Inc.*, 9 F.3d 607 (7th Cir.1993) (opinion of plaintiff's expert that plaintiff's kidney failure caused by ingestion of ibuprofen properly excluded); *Muzzey v. Kerr–McGee Chemical Corp.*, 921 F.Supp. 511 (N.D.Ill.1996) (opinion of plaintiff's experts that plaintiff's disease of polycythemia vera caused by exposure to thorium tailings properly excluded); *Schmaltz v. Norfolk & Western Railway Co.*, 878 F.Supp. 1119 (N.D.Ill.1995) (opinion of plaintiff's experts that plaintiff's respiratory disease caused by exposure to herbicides atrazine and tebuthiuron properly excluded); *Casey v. Ohio Medical Products*, 877 F.Supp. 1380 (N.D.Cal.1995) (opinion plaintiff's expert that plaintiff's hepatitis caused by exposure to halothane properly excluded); *Chikovsky v. Ortho Pharmaceutical Corp.*, 832 F.Supp. 341 (S.D.Fla.1993) (opinion of plaintiff's expert that plaintiff's birth defects caused by application of Retin–A by mother to skin during pregnancy properly excluded).

In accordance with the mandate of *Daubert*, this court must perform its gatekeeping role and exclude all of the testimony of plaintiffs' expert witnesses. The defendant's motion in limine shall be granted. Without this testimony, plaintiffs cannot establish a genuine issue of material fact as to causation. Therefore, the court shall also grant defendant's motion for summary judgment.

**IT IS THEREFORE ORDERED** that defendant's motion in limine (Doc. # 61) be hereby granted.

**IT IS FURTHER ORDERED** that defendant's motion for summary judgment (Doc. # 62) be hereby granted. Judgment is hereby granted for the defendant and against the plaintiff.

**IT IS SO ORDERED.**